# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PATAGONIA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18-cv-07440 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| XIE JI PING, et al., | ) | |
| | ) | Magistrate Judge Young B. Kim |
| Defendants. | ) | |

**<u>Unpublished Opinions</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| CHROME HEARTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 15 C 3491 |
| | ) | |
| THE PARTNERSHIPS AND | ) | Judge Virginia M. Kendall |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE "A", | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

On April 21, 2015, Plaintiff Chrome Hearts LLC instituted the instant action against a litany of foreign online marketplace accounts, alleging that the Defendant Internet Stores infringed upon a number of Chrome Hearts' trademarks by selling counterfeit goods to consumers in the United States. Before the Court is Chunshan Zhang's Motion to Intervene pursuant to Federal Rule of Civil Procedure 24.[1] Zhang contends that his online account was improperly included in this action. For the reasons set forth below, the Court denies Zhang's Motion to Intervene. (Dkt. No. 44.) Chrome Hearts' Motion to Strike Zhang's reply brief (Dkt. No. 95) is dismissed as moot.[2]

## BACKGROUND

Chrome Hearts is an American luxury brand that designs and manufactures apparel, leather goods, jewelry, accessories, home goods, and furniture. (Dkt. No. 1 at 3.) Chrome Hearts is the owner of various trademarks comprising the Chrome Hearts mark and its other design

---

[1] Gang Zeng also filed a motion to intervene in this case. (Dkt. No. 46.) He withdrew his petition on September 8, 2015. (Dkt. No. 111.)
[2] Zhang also sought leave to file a motion to dismiss for lack of personal jurisdiction. (Dkt. No. 94.) Because the Court denies his motion to intervene, the motion to dismiss is moot.

components. (*Id*. at 4.) The Defendant Internet Stores are individuals or business entities residing in the People's Republic of China and conducting business throughout the United States. (*Id*. at 17.) In the instant action, Chrome Hearts contends that the Defendant Internet Stores sell and offer for sale counterfeit products featuring Chrome Hearts' registered trademarks. (*Id*. at 3.)

On April 27, 2015 the Court exercised jurisdiction over the Defendant Internet Stores and granted Chrome Hearts' Temporary Restraining Order ("TRO"). (Dkt. No. 26.) The TRO ordered PayPal, Inc. to restrain and enjoin any accounts or funds connected with the Defendant Internet Stores. (*Id*.) Relevant to the instant proceedings, PayPal identified the account "greenapple-pie@hotmail.com" as Defendant Tinachen Fashion Store's PayPal account and froze $7,755.08 in the account. (Dkt. No. 45 at 2.) "Greenapple-pie@hotmail.com" is an e-mail account allegedly owned by Zhang and is linked to his PayPal account. (*Id*.) Zhang operates an Ebay online store selling rifle accessories and electronic products. (*Id*.) Zhang states that he lent the owner of Tinachen his PayPal account as a personal favor but that his individual business activities are not related in any fashion to the underlying litigation. (*Id*.) In addition to the amount frozen in his PayPal account, Zhang claims he is unable to conduct sales on his Ebay account due to the TRO. (*Id*.) As a result, Zhang alleges that he has suffered a loss of approximately $6,800 in Ebay business revenue. (*Id*.)

Zhang moves to intervene in this action filed by Chrome Hearts against the Defendant Internet Stores on the above bases, claiming that his property interest in his PayPal account is affected by this lawsuit. On May 5, 2015, an attorney filed an appearance on behalf of Zhang, the alleged owner of the "greenapple-pie@hotmail.com" e-mail account. (Dkt. No. 32 at 1.) This Court granted Zhang leave to file a motion to intervene on May 7, 2015. (Dkt. No. 34 at 1.) On May 18, 2015, Zhang filed his Motion to Intervene arguing intervention as of right under Rule

24(a) or alternatively permissive intervention under Rule 24(b). (Dkt. No. 44; Dkt. No. 46.) Zhang's attorney withdrew from representing him on September 1, 2015. (Dkt. No. 110.) For the reasons set forth below, the Court denies Zhang's motion.

## DISCUSSION

As a threshold matter, the Court finds that Zhang's Motion to Intervene is properly pled under Rule 24(c) despite Chrome Hearts' objection. Rule 24(c) requires that a Motion to Intervene be "accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Zhang's Motion to Intervene provides a claim setting forth his right to intervene in this case. In addition, although Chrome Hearts correctly states that this Court found it likely to succeed on its *prima facie* case, that finding is limited to the named Defendant Internet Stores. Although properly pled, however, Zhang's Motion to Intervene is denied for the reasons set forth below.

## I. Intervention as of Right under Rule 24(a)

A party seeking to intervene as of right must satisfy four requirements: (1) the motion to intervene must be timely; (2) the party seeking to intervene must claim an interest related to the subject matter of the action; (3) the party seeking to intervene must be so situated that the disposition of this action threatens to impair or impede the party's ability to protect that interest; and (4) the existing parties must not be adequate representatives of the movant's interest. Fed. R. Civ. P. 24(a); *see also Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773 (7th Cir. 2007). A court may deny a motion to intervene if the movant fails to establish any one of these requirements. *Id.*

### A. Timeliness

The timeliness requirement is a flexible one and is determined by considering the totality of the circumstances, leaving much to the sound discretion of the Court. *See Shea v. Angulo,* 19

F.3d 343, 348-49 (7th Cir. 1994); *Zurich Capital Markets, Inc. v. Coglianese,* 236 F.R.D. 379, 383 (N.D. Ill. 2006) (St. Eve, J.) ("Determining whether a motion for intervention is timely is 'committed to the sound discretion of the district judge.' ") (quoting *South v. Rowe,* 759 F.2d 610, 612 (7th Cir. 1985)). The test for evaluating timeliness essentially sets out a reasonableness standard; potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights and act promptly in response. *See Heartwood, Inc. v. U.S. Forest Service, Inc.,* 316 F.3d 694, 701 (7th Cir. 2003). Here, the Court finds that Zhang's Motion to Intervene was made within a reasonable period of time. Chrome Hearts filed this lawsuit on April 21, 2015. (Dkt. No. 52 at 4.) After PayPal froze his account on April 27, 2015, Zhang sought representation in the United States and retained counsel on May 5, 2015. (Dkt. No. 32 at 1.) Zhang and filed his Motion to Intervene shortly thereafter on May 18, 2015. (Dkt. No. 44; Dkt. No. 46.) Chrome Hearts does not suggest that Zhang, by exercising reasonable diligence, should have learned of this suit earlier. As a result, Zhang acted with appropriate timeliness. *See Nissei Sangyo America, Ltd. v. U.S.*, 31 F.3d 435, 439 (7th Cir. 1994) ("given . . . the complexity of finding counsel to intervene in a case nearly halfway around the globe, three months does not seem to us to be an unreasonable length of time in which to accomplish this task."). The Court therefore does not deny Zhang's motion on timeliness grounds.

**B.      Interest Related to the Subject Matter of the Underlying Claim**

However, the Court denies Zhang's Motion to Intervene because he fails to show a "direct, significant, and legally protectable" interest in the subject matter at issue in this lawsuit. *See Wis. Educ. Ass'n Council v. Walker,* 705 F.3d 640, 658 (7th Cir. 2013). The Court considers "the issues to be resolved by the litigation and whether the potential intervenor has an interest in those issues." *See, e.g.*, *Hanover Ins. Co. v. L & K Development,* No. 12 C 6617, 2013 WL

1283823, at *2 (N.D. Ill. Mar. 25, 2013) (quoting *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 322 (7th Cir. 1995)). Zhang alleges that even though he (1) is not related to the trademark infringement claims and (2) unequivocally denies any involvement in the underlying suit, he has a substantial interest in the litigation because the money in the frozen PayPal account belongs to him. (Dkt. No. 45; Dkt. No. 47.) But a third party who attempts to intervene because he has some outstanding monetary claim against one of the parties properly in the case has nothing more than a " 'betting' interest in the outcome of [the] case." *Reich,* 64 F.3d at 322.

Zhang's motion fails because he does not demonstrate the requisite direct interest in the substantive outcome of any of the trademark issues in this litigation. Even accepting the Zhang's specious argument that he lent his PayPal account to a Defendant Internet Store, Zhang's interest is entirely contingent upon Tinachen prevailing against Chrome Hearts. If Tinachen is unsuccessful, then Zhang contends that he will be unable to recover the money in his PayPal account. He therefore possesses the very sort of betting interest in the outcome of a case for which Rule 24(a) does not permit intervention. *See Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009) ("the fact that you might anticipate a benefit from a judgment in favor of one of the parties to a lawsuit – maybe you're a creditor of one of them – does not entitle you to intervene in their suit"). Zhang's interest has little to do with the trademark infringement claims raised by Chrome Hearts. The question of the ownership of a PayPal account is tangential to the underlying dispute here and is better addressed through direct action by Zhang against Tinachen in another forum. *See, e.g.*, *Manolo Blahnik Int'l Ltd. v. The Partnerships and Unincorporated Ass'ns Identified on Schedule "A"*, No. 14 CV 9752, Dkt. No. 75 at 4 (Coleman, J.) ("it seems that [the proposed intervenors'] claims are better directed toward the individuals in China to whom they lent their PayPal accounts and who allegedly used those accounts for illicit

purposes"). Because Zhang has no legal interest in the ultimate disposition of the trademark infringement claims, the Court denies his Motion to Intervene.

## C. Ability to Protect Interest

Zhang similarly fails to satisfy this factor. An intervenor must also show that disposition of the underlying action may impair the intervenor's ability to protect its interest in the litigation. *Reich*, 64 F.3d at 321-322. "Impairment exists when the decision of a legal question . . . would, as a practical matter, foreclose the rights of the proposed intervenor in a subsequent proceeding." *Shea v. Angulo,* 19 F.3d 343, 347 (7th Cir. 1994). That is not the case here because a finding against Tinachen on Chrome Hearts' trademark infringement claims would not inhibit Zhang from filing an action against her to reclaim his alleged property interest in the PayPal funds. Because Zhang has alternative avenues to resolve his separate issues with Tinachen, his interests are not impaired by the adjudication of this case. The Court denies Zhang's Motion to Intervene for failure to satisfy this ground as well.

## D. Adequate Representation of Interests

Finally, intervenors must show that the existing parties to the action do not adequately represent their interests. *See* Fed. R. Civ. P. 24(a)(2). While the Defendant Internet Stores likely are inadequate representatives of Zhang's interests, this is more a reflection of Zhang's lack of interest in the subject matter of the claim at issue here than anything else. Zhang is not attempting to respond to any of the allegations brought forward by Chrome Hearts, in fact, he unambiguously denies any involvement in the underlying claims whatsoever. Nor is Zhang attempting to defend the fundamental trademark infringement claims levied against Tinachen. Rather, Zhang's interests lie in the alleged improper use of his PayPal account. Zhang's arguments and evidence will therefore be entirely unrelated to the alleged illegal activity by the

Defendant Internet Stores. This separation again stems from the fact that Zhang does not have a direct interest in Chrome Hearts' trademark infringement suit. To resolve his PayPal account issue, Zhang's claim is better suited as a separate action against Tinachen.

Because Zhang does not have a direct interest in this case that will be impaired if he does not intervene, intervention as of right is not appropriate under Rule 24(a).

## II. Permissive Intervention under Rule 24(b)

Zhang alternatively seeks permissive intervention pursuant to Fed. R. Civ. P. 24(b). Even when intervention as of right is not available, courts may still exercise their discretion to allow permissive intervention under Rule 24(b). *See Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000). Permissive intervention is appropriate only when the movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Courts also consider whether the permissive intervention would "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *see also Vollmer v. Publishers Clearing House*, 248 F.3d 698, 707 (7th Cir. 2001).

Zhang argues that he shares a common question of law and fact with the Defendant Internet Stores because he is being held accountable for the alleged trademark infringing activities. However, for the same reasons as set forth above, Zhang does not share a common question of law or fact with the main action. The underlying questions of law and fact in this case revolve around trademark infringement claims, not a property issue concerning a PayPal account. As a result, the Court, in its discretion, does not believe that intervention would be appropriate under Rule 24(b) and denies Zhang's requests.

## **CONCLUSION**

For the reasons stated above, the Court denies Zhang's Motion to Intervene.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 9/9/2015

Case: 1:14-cv-09752 Document #: 467 Filed: 05/14/18 Page 11 of 75 PageID #:32748

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MANOLO BLAHNIK INTERNATIONAL, LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-09752 |
| | ) | |
| THE PARTNERSHIPS and | ) | Judge Sharon Johnson Coleman |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE "A," | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

Plaintiff Manolo Blahnik International Limited ("MBIL") sued over 500 internet domain names, domain name registrants, and marketplace accounts alleging that these Defendants sold or offered for sale on the internet unlicensed products featuring counterfeit versions of MBIL's trademarks.  On February 10, 2015, the Court entered final default judgment against all Defendants with the exception of one who MBIL voluntarily dismissed.  Before the Court are XiuMei Xu and Wang Qing Xan's motions to vacate the judgement against Defendants.  For the reasons stated herein, the motions are denied.

### Discussion

The Court is well-acquainted with trademark infringement cases where plaintiffs claim that relatively unidentifiable entities or owners of internet sites are selling counterfeit or "knockoff" versions of their goods.  This case is no different than the others except that approximately thirty days after entry of default judgment the Court received "notice" of objections from two individuals with alleged relationships to two of the 500-plus Defendants

listed in Schedule A.

XiuMei Xu ("Xu") and Wang Qing Xan ("Xan") are not parties to this case as neither is listed on Schedule A as a Defendant and neither has been granted intervenor status. Nonetheless, Xu's attorney filed an appearance on March 14, 2015 and Xan's attorney filed a motion to intervene on March 17, 2015. (Dkt. 52, 53.) The motion to intervene filed on behalf of Xan failed to comply with Local Rule 5.3(b) requiring proper notice of motion and was filed by an attorney who had not filed an appearance in the case. Accordingly, the motion was stricken.[1] (Dkt. 53, 55.) Notwithstanding the deficiency, the motion would have been denied in any event as Xan's counsel failed to address any of the factors required to establish permissive intervention or intervention as of right. *See* Fed. R. Civ. P. 24(a), (b).[2]

Xu's counsel then appeared before the Court on March 18 and expressed his client's desire to have the judgment vacated because her PayPal account had been seized and turned over to MBIL. At the time, MBIL represented, perhaps mistakenly, that Xu was a Defendant who was previously found in default. Accordingly, the Court allowed Xu an opportunity to formally file a motion on the issue of vacating the judgment and ordered a briefing schedule. While Xu's motion was pending, Xan apparently retained new counsel who filed an appearance and properly filed and noticed a motion to set aside the default judgment. (Dkt. 69, 71.) The Court heard

---

[1] A subsequent motion to vacate filed by the same attorney on behalf of Xan was also stricken for failure to comply with Local Rule 5.3(b). (Dkt. 56, 63.)

[2] In the absence of a statute giving an absolute right to intervene, Rule 24(a) requires that the applicant establish (1) that the motion to intervene is timely, (2) an interest relating to the subject matter of the main action; (3) that disposition of the action threatens to impair that interest, and (4) lack of adequate representation by existing parties. *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773 (7th Cir.2007). Permissive intervention under Rule 24(b) requires the applicant to demonstrate that its claim or defense is common with a claim or defense in the suit. *Keith v. Daley*, 764 F.2d 1265, 1272 (7th Cir.1985). If this condition is satisfied, the court must then decide as a matter of discretion whether intervention should be allowed. The court can consider timeliness of the motion and prejudice to the parties. *Id.*

argument on Xu's fully briefed Rule 60(b)(4) motion to vacate on April 15. Because Xan suffered the same standing defect identified by the Court, as a courtesy to the "parties" the Court continued Xu's motion until the next status hearing. The Court again heard argument from Xu and Xan on April 22.

Both parties who are attempting to participate in this litigation, Xu and Xan, make the same specious claim: that their PayPal accounts were voluntarily lent to an actual Defendant, but judgment should be vacated and the funds returned since they either did not or would not "authorize" illicit use of their accounts. In support of their claims, Xu argues that the Court lacks personal jurisdiction over her and her assets, and both argue that they somehow have a meritorious defense because they have not performed the illegal actions alleged in the complaint. In the end, these arguments woefully miss the mark.

As the Court has stated on numerous occasions, the threshold issue is whether Xu or Xan has standing to file a motion to vacate on any grounds. Despite the Court's questioning as to their client's standing there has been no response other than Xan's counsel's comment that his client has "suffered injury in fact." Simply put, neither Xu nor Xan have stated any reason why they should have standing to contest the default judgment. And the Court finds that no reason exists.

Moreover, neither party has ever filed a proper motion for leave to intervene.[3] Even so, the filings and counsels' arguments reveal that even if granted, intervention would be futile as well as a waste of judicial resources. Both Xu and Xan admit that they loaned their respective PayPal accounts to a named Defendant. This does not establish a defense for them or any related

---

[3] MBIL has argued that any motion to intervene would be untimely. However, as noted above Xu and Xan attempted to participate in this litigation, albeit unsuccessfully at times, within 32 days of final judgment. The Court finds that there would be no undue delay.

Defendant to MBIL's *prima facie* case of trademark infringement.[4]  The Court is perplexed at counsels' insistence that the bald allegations asserted at argument and in their briefs afford them a basis to intervene or that if allowed to intervene their claims would succeed.  Their clients are located in China and are essentially contesting the jurisdiction of the Court while at the same time claiming they have some right to participate in this litigation.  The Court finds it suspicious at best that only now the owner of the Defendant entity to whom Xu lent her PayPal account has decided to participate in this litigation through an affidavit in support of Xu's motion, yet does not join in Xu's motion to vacate or assert her own.  Counsels' positions at argument that their clients have meritorious defenses against the actual claims asserted in MBIL's complaint are supported by nothing more than counsels' bare allegations.  Moreover, counsels' belief that this Court would simply vacate its judgment and order a turn-over of funds without testing the veracity of their claims is incredible.  Even if the Court allowed extensive discovery, for the reasons above their theory would not be a defense to MBIL's claims and would have no effect on the Court's judgment.

Xu and Xan appear to have raised their claims before the wrong tribunal.  As the Court has stated numerous times, it seems that Xu and Xan's claims are better directed toward the individuals in China to whom they lent their PayPal accounts and who allegedly used those accounts for illicit purposes.

Finally, the Court does not reach Xu's argument that the default judgment is void because the court lacks personal jurisdiction because, as noted above, Xu is not a defendant or an

---

[4]  In its Order granting MBIL a permanent injunction, the Court found that MBIL has proved a *prima facie* case of trademark infringement because, (1) the MBIL Trademarks are distinctive marks and are registered with the U.S. Patent and Trademark Office on the Principal Register, (2) Defendants are not licensed or authorized to use any of the MBIL Trademarks, and (3) Defendants' use of the MBIL Trademarks is causing a likelihood of confusion as to the origin or sponsorship of Defendants' products with MBIL.  (Dkt. 36, p. 1-2.)

intervenor in this case and thus has no standing to contest the judgment on any grounds.

**Conclusion**

XiuMei Xu and Wang Qing Xan's motions to vacate the judgement against Defendants [57, 69] are denied and plaintiff's related motion [66] is stricken as moot.


SO ORDERED.

_____
SHARON JOHNSON COLEMAN
United States District Judge

DATED: April 22, 2015

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



MAR 2 7 2019

---

WowWee Group Ltd., *et al.*,

Plaintiffs,

—v—

Meirly, *et al.*,

Defendants.

---

18-CV-706 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Before the Court is Plaintiffs' motion for the entry of default judgment. For the following reasons, the Court will GRANT Plaintiffs' motion as to its federal and one of its state claims, enter a permanent injunction, and award Plaintiffs statutory damages. The Court declines to enter a post-judgment asset freeze.

## I. Procedural Background

On January 26, 2018, Plaintiffs filed their Complaint along with an *ex parte* Application for (1) a temporary restraining order ("TRO"); (2) an Order to Show Cause ("OTSC") why a preliminary injunction should not issue; (3) an asset restraining order; (4) an order authorizing alternative service by electronic mail; and (5) an order authorizing expedited discovery against Defendants. *See* Dkt. Nos. 3, 8–23. Also on that date, the Court entered the TRO, set an OTSC Hearing, restrained Defendants' assets, and authorized electronic service and expedited discovery. Dkt. No. 11; Dkt. No. 65 ¶ 13. Relying on information obtained in third-party discovery, on February 6, 2018, Plaintiffs served copies of the TRO, Summons, Complaint, and all papers filed therewith on the Defendants. Dkt. No. 65 ¶ 15–18, Ex. C. On February 8, 2018, the Court held an OTSC Hearing. *See* Dkt. No. 65 ¶ 19. No Defendants appeared and the Court

entered a preliminary injunction order ("PI Order") against all Defendants mirroring the terms of the TRO. *See* Dkt. No. 65 ¶¶ 19–20. Plaintiffs served Defendants with the PI Order on February 9, 2018. Dkt. No. 65 ¶ 21; Dkt. No. 28. Under the terms of the TRO, all Defendants' deadlines to answer or otherwise respond were February 26, 2018. Dkt. No. 65 ¶ 22; *see* Dkt. No. 5. Some did not do so, and on May 14, 2018, Plaintiffs informed the Court that they intended to seek default judgment against nonappearing Defendants. Dkt. No. 46. This Court ordered Plaintiffs to so file by June 29, 2018. Dkt. Nos. 45, 47. On May 15, 2018, Plaintiffs requested Clerks' Certificates of Default, which they received on May 18, 2018. Dkt. Nos. 48–49; Dkt. No. 65, Ex. E. At the same time, litigation, an initial pretrial conference, and settlement discussions proceeded with respect to the appearing Defendants. *See* Dkt. Nos. 29–47, 50–62.

On June 28, 2018, Plaintiffs filed their motion for default judgment against the 45 Defendants they represent had not formally appeared or responded to the complaint as of that date ("the Defaulting Defendants").[1] Dkt. No. 63. In accordance with Rule 3.L of the Court's Individual Practices in Civil Cases, the motion for default judgment and supporting paperwork were also served on the Defaulting Defendants, and an affidavit of service filed. Dkt. No. 66.

On February 7, 2019, the Court ordered additional briefing regarding the Court's exercise of supplemental jurisdiction in this matter. Dkt. No. 77. On February 28, 2019, Plaintiffs filed that briefing and supporting documents. Dkt. Nos. 80–81.

---

[1] These defendants are identified on page iv of Plaintiffs' Memorandum of Law as: Meirly, Men's fashion shoes store, Miss Moon, Most time, New Fashion Product Toy, NewPage0, Pacento Offical Shoes Store, padarg, pencilcase, ppbau, rfhngmrtrnjjted, Run-rabbit, sc888999, sexy women dress, Shenzhen Yuriy Trading Co., Ltd., shenzhenxinshidaidianzishangwudian, smartweicong, SONG789, summerdance, superllv, TIAN MA KE JI, tobest2016, Tsuneyo machinery accessories, TVG, Valuequalityandservice, Warm cocoa coffee, wenshuixiang, wh, windlyfly, Woo Chant, worldmakeup, wumanna, Xiaofeng001, xiaoxiangzi418, yangronggxxmm@163.com, yiwutengyue, YJ Stylish store, yjnfnhy, z_living, ZDSS, zhangshaoping85, zhangyazi, zhangyilin66, Zhi jia daily necessities and ZSJ. Dkt. No. 64, Br. at iv.

2

## II. Factual Background

Plaintiffs WowWee Group Limited, WowWee Canada, Inc., and WowWee USA, Inc. ("WowWee" or "Plaintiffs") are designers, developers, marketers, and distributors of robotic toys and consumer entertainment products, including interactive hand-held robotic toys known as Fingerlings Products. Compl. ¶¶ 8–9. They have obtained federal copyright and trademark registrations in and relating to the Fingerling Products. Compl. ¶¶ 12–16. In this action, they allege counterfeiting and infringement of WowWee's federally registered trademarks in violation of the Lanham Act, 15 U.S.C. §§ 1114(1)(a)–(b), Compl. ¶¶ 46–68; false designation of origin, passing off and unfair competition in violation the Lanham Act, 15 U.S.C. § 1125(a), Compl. ¶¶ 69–77; copyright infringement of federally registered copyrights in violation of the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, Compl. ¶¶ 78–85; and related state and common law claims, Compl. ¶¶ 86–105.

Plaintiffs allege that the Defaulting Defendants are merchants on the Wish.com "marketplace and e-commerce platform," through which they "advertise, distribute, offer for sale, sell and ship their retail products . . . to consumers worldwide and specifically to consumers residing in the U.S., including New York." Compl. ¶ 24. Plaintiffs claim that the Defaulting Defendants have used their user accounts and merchant storefronts, without authorization, to manufacture, import, export, advertise, market, promote, distribute, display, offer for sale, and sell infringing or counterfeit products to "U.S. consumers, including those located in the state of New York." Compl. ¶¶ 32–33. The alleged infringing or counterfeit products constitute "products bearing or used in connection with the Fingerlings Marks and/or Fingerlings Works," and/or packaging or labels bearing or used in connection with the same, and/or products bearing or used in connection with confusingly or substantially similar artworks or products. Compl.

3

¶ 32.

Plaintiffs represent that they retained a trademark infringement research services firm to investigate merchants selling infringing and counterfeit products on the Wish platform, and that the firm "specified a shipping address located in New York . . . and verified that each Defendant provides shipping to the New York address." Compl. ¶ 35. They allege that "each Defendant provides shipping and/or has actually shipped counterfeit products to the U.S., including to customers located in New York." Compl. ¶ 36. In their supplemental submission, Plaintiffs document each Defaulting Defendant's United States and New York sales, indicating that 34 Defaulting Defendants have made at least one New York sale and that it was possible to complete a checkout page for an order to a New York address from every Defaulting Defendant. Dkt. No. 81-2 at 2; Dkt. No. 81-1; *see* Dkt. No. 21 ¶¶ 8–10.

## III.   Jurisdiction

### A.   Subject Matter Jurisdiction

The Court has federal subject matter jurisdiction over Plaintiffs' federal copyright and trademark claims and claims arising out of such claims under 28 U.S.C. §§ 1331 and 1338(a), 15 U.S.C. § 1121, and 28 U.S.C. § 1338(b), and supplemental jurisdiction over related state claims under 28 U.S.C. § 1367(a).

### B.   Personal Jurisdiction

The Court also has personal jurisdiction over Defendants in this judicial district. The Court engages in a two-step analysis to determine whether it has personal jurisdiction over a defendant: it (1) applies the long-arm statute of the forum state and then (2) analyzes whether the exercise of that personal jurisdiction "comports with the Due Process Clause." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163–64 (2d Cir. 2010).

4

### 1. The New York Long-Arm Statute Supports a Finding of Personal Jurisdiction[2]

Plaintiffs point to three different predicates for personal jurisdiction under the New York long-arm statute. Because the Court concludes that personal jurisdiction exists under N.Y. C.P.L.R. § 302(a)(1), the Court need not address their other theories.

Section 302(a)(1) permits the Court to exercise personal jurisdiction over a "non-domiciliary who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). The "jurisdictional net" cast by this subsection reaches those defendants who, under the totality of circumstances, "purposefully avail[ themselves] of the privilege of conducting activities within New York, thus invoking the benefits and protections of its law." *Mattel, Inc. v. Adventure Apparel*, No. 00-CV-4085 (RWS), 2001 WL 286728, *2 (S.D.N.Y. Mar. 22, 2001) (citation and internal brackets omitted).

A "highly interactive website" with "significant commercial elements" "may confer personal jurisdiction" under this subsection. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (quoting in part *Vandermark v. Jotomo Corp.*, 839 N.Y.S.2d 931, 932–33 (4th Dept. 2007)). Accordingly, courts interpreting New York law have found personal jurisdiction over defendants who operated websites offering counterfeit or infringing items "for sale to New York customers; permit[ting] New York customers to purchase [such items], and facilitat[ing] [their] shipment . . . into New York." *Id.* at 168. A single sale may be sufficient provided that the defendant's activities were purposeful and there was a substantial relationship

---

[2] If any of the Defaulting Defendants were in fact domiciliaries of New York, the Court independently has personal jurisdiction over them under N.Y. C.P.L.R. § 301; in the absence of any domiciliary allegations, the Court assumes defendants are not domiciled in New York.

between the transaction and the claim asserted. *See, e.g.*, *Chloe*, 616 F.3d at 163–64; *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015). Some courts have also concluded that operating an interactive website may be enough, standing alone, to support personal jurisdiction. *See, e.g.*, *Thomas Pub. Co. v. Indus. Quick Search, Inc.*, 237 F. Supp. 2d 489, 492 (S.D.N.Y. 2002) ("If [defendant] wishes to operate an interactive website accessible in New York, there is no inequity in subjecting [it] to personal jurisdiction here.").

Here, Plaintiffs stop short of alleging that each Defaulting Defendant made an actual sale in New York State, and rest instead on the fact that each Defaulting Defendant offers its products for sale to New York customers and provides shipping to New York shipping addresses. The requirements of Section 302(a)(1) are met for both groups of defendants. First, each of the thirty-four Defaulting Defendants who made sales into New York State purposefully availed themselves of the privileges of conducting activities in New York by shipped counterfeit items to New York addresses.

The Court also has personal jurisdiction over the Defaulting Defendants who have not been shown to have made sales into New York. As Plaintiffs detail, courts in this district— including the undersigned—routinely exercise personal jurisdiction over defendants in analogous cases based only on completed checkout pages. *See* Dkt. No. 80 at 5 n.5. Although many of these cases were default judgments that did not involve reasoned opinions, the Court follows their lead for two reasons.

First, Plaintiffs' submissions indicate that it is likely that the Defaulting Defendants made sales into the New York market that are not documented in Plaintiffs' papers. Their affidavits in support of their applications for a TRO and for default judgment assert that merchants like the Defaulting Defendants operate near-identical merchant pages and frequently conceal the scope

and interworking of their counterfeiting operations, suggesting that the merchants may not be distinct. Dkt. No. 23 ¶¶ 13–15. For example, as discussed at the Initial Pretrial Conference held on June 13, 2018, Plaintiffs learned after their appearance in this action that 30 of the non-defaulting defendants shared a common owner. Dkt. No. 64 ("Br.") at 6 n.5. Moreover, sellers on Wish likely utilize other e-commerce platforms in addition to Wish, which platforms they may also use to make sales of the same infringing products into New York State. Dkt. No. 65 ¶¶ 31–33. At the default judgment posture and without the benefit of discovery, Plaintiffs likely did not uncover all instances of sales into New York State. These limitations counsel against putting undue emphasis on proven sales in the default judgment context, especially when other factors favor the exercise of personal jurisdiction. Namely, in addition to the likely overlap between Defaulting Defendants, Defaulting Defendants purposefully listed products on a website that offers shipping to New York, and there is a substantial relationship between those offers for sale and the trademark infringement harms alleged to have been inflicted in New York.

Furthermore, the case law has stopped short of requiring additional conduct beyond maintaining an interactive website that offers products to consumers. In *Citigroup, Inc. v. City Holding Co.*, for example, the district court went so far as to "conclude[ ]" that the business's activity over the Internet, which consisted of posting information about products, taking applications, and providing email and live chat responses to customers, "confer[red] personal jurisdiction under CPLR § 302(a)(1),"—and remarked only that the other activities served to "bolster" its jurisdictional finding. 97 F. Supp. 2d 549, 555–56 (S.D.N.Y. 2000). Although the website at issue in *Citigroup* likely facilitated a greater range of activity with consumers than the website at issue here, the logic of *Citigroup*, *Chloe*, and other circuit case law is consistent with finding that Defaulting Defendants' behavior here was sufficient to constitute transacting

7

business for the purposes of Section 302(a)(1).

Some courts in this district have declined to assert jurisdiction in the absence of allegations that the websites at issue were "actually used to effect commercial transactions with customers in New York," *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-CV-2897 (JPO), 2018 WL 2022626, at *4 (S.D.N.Y. Apr. 30, 2018) (quotation omitted), such as targeted solicitation, contracts with New York agents, or documented sales to New York customers. *See, e.g.*, *ISI Brands, Inc. v. KCC Int'l, Inc.*, 458 F. Supp. 2d 81, 89 (E.D.N.Y. 2006); *Savage Universal Corp. v. Grazier Const., Inc.*, No. 4-CV-1089, 2004 WL 1824102, at *9 (S.D.N.Y. Aug. 13, 2004) (Lynch, J). At least when, as here, Defaulting Defendants' alleged conduct and failure to appear serve to limit Plaintiffs' ability to show that such commercial transactions occurred, the Court finds such showing unnecessary.

### 2. Exercising Personal Jurisdiction Comports with the Due Process Clause

Due process requires "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington Office of Unemployment Compensation & Placement*, 326 U.S. 310, 316 (1945) (quotation omitted). This standard is satisfied without further inquiry by state long-arm statutes, like Section 302, that permit the exercise of jurisdiction in a narrower range of circumstances than the Due Process Clause. *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 469 (S.D.N.Y. 2008). Accordingly, the Court finds its exercise of personal jurisdiction consistent with the Due Process Clause for all of the reasons explained above.

## IV. Legal Standard

Federal Rule of Civil Procedure 55 sets out a two-step procedure to be followed for the

entry of judgment against a party who fails to defend: the entry of a default, and the entry of a default judgment. *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005). The first step, entry of a default, simply "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011); Fed. R. Civ. P. 55(a). The second step, entry of a default judgment, "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted" by the pleadings. *Mickalis Pawn Shop*, 645 F.3d at 128; *see also* Fed. R. Civ. P. 54(c).

Whether entry of default judgment at the second step is appropriate depends upon whether the allegations against the defaulting party are well-pleaded. *See Mickalis Pawn Shop*, 645 F.3d at 137. Once a party is in default, "a district court must accept as true all of the factual allegations of the non-defaulting party and draw all reasonable inferences in its favor." *Belizaire v. RAV Investigative and Sec. Servs., Ltd.*, 61 F. Supp. 3d 336, 344 (S.D.N.Y. 2014). But because a party in default does not admit conclusions of law, a district court must determine whether the plaintiff's allegations are sufficient to establish the defendant's liability as a matter of law. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). The legal sufficiency of these claims is analyzed under the familiar plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), aided by the additional step of drawing inferences in the movant's favor. *Belizare*, 61 F. Supp. 3d at 344.

**V.      Discussion**

Turning to the present case, the Court first examines the threshold question of whether joinder is appropriate in this action. Concluding that it is, the Court next examines whether

9

Plaintiffs' claims meet the standard for default judgment and addresses appropriate remedies.

### A.     Joinder Remains Appropriate

"Parties may be joined when" there are common questions of law or fact and when "(1) the defendants are jointly and severally liable under the claims asserted by the plaintiff, or (2) the claim for relief by the plaintiff arises out of the same transaction, occurrence, or series of transactions or occurrences." *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 243 (S.D.N.Y. 2012) (Nathan, J.) (citing Fed. R. Civ. P. 20(a)(2)).  Under the Federal Rules, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties, and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966).

The Court finds these elements met in this action.  Because of the similar course of conduct in which all Defaulting Defendant are alleged to have engaged, this case clearly presents common questions of law or fact.  The closer question is whether the claims for relief arise out of the same series of transactions or occurrences notwithstanding the fact that they are asserted against dozens of different merchants on the Wish.com platform.

Plaintiffs assert two reasons for finding this standard met in this case.  First, Plaintiffs infer a "logical relationship" between the Defaulting Defendants.  There are significant similarities across the Defaulting Defendants' merchant storefronts, and Plaintiffs contend that many Defaulting Defendants likely share common ownership, even if that ownership is not readily identifiable based on the Wish.com platform. Br. at 5–8; *see also Bulgari, S.P.A. v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, No. 14-CV-4819 (RAG) (MMR), 2014 WL 3749132, at *1–5 (N.D. Ill. Jul. 18, 2014) (recommending granting preliminary injunction against similar host of alleged counterfeiters) *report and recommendation adopted*

10

2014 WL 3765854, at *2 (N.D. Ill. July 29, 2014). Second, Plaintiffs note that Defendants have failed to appear and raise any issue regarding joinder. As a consequence, there are no defenses raised in this action, let alone conflicting ones, that would require separate factual and legal analysis. As a final matter, Plaintiffs note the practical argument that China-based counterfeiters like Defaulting Defendants are in constant communication and could easily spread news of impending lawsuits to one another, frustrating an attempt to litigate against each seller individually. Br. at 6.

The Court finds these arguments sufficient to support its continued declining to sever this action as to each Defendant. Although there may be concerns regarding the appropriateness of joinder of many distinct defendants, those concerns are moderated when no conflicting defenses have been asserted and when Plaintiff has established a strong likelihood that many of the Defaulting Defendants have engaged in coordinated actions or share ownership.

### B. Default Judgment on Plaintiffs' Federal and One of its State Claims Is Warranted

In this action, Plaintiffs allege eight causes of action arising out of Defaulting Defendants' alleged marketing and sale of counterfeit Fingerlings Products.

#### 1. Default Judgment on Plaintiffs' Counterfeiting, Infringement, and False Designation Claims Is Warranted

The first three counts of Plaintiffs' complaint allege trademark counterfeiting, trademark infringement, and false designation claims in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a) and (b) and § 1125(a).

The Lanham Act imposes liability on any person who in connection with the sale, offering for sale, or distribution of a good either uses a counterfeit of a registered mark or counterfeits such mark in advertising or packaging materials when such use or counterfeiting is likely to cause confusion. 15 U.S.C. § 1114(1)(a)–(b). It also bars as false designation the use in

11

commerce of any word, term, name, symbol, device, or combination thereof, which is likely to cause confusion as to the origin, sponsorship, or approval of a person's goods with those of another person or which misrepresents the nature, characteristics, qualities, or geographic origin of another person's goods. 15 U.S.C. § 1125(a)(1)(A)–(B).

Despite differences in the statutory language, the same legal test applies to each claim asserted here. *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). Courts ask whether the allegedly infringed mark "is entitled to protection" and, if so, "whether use of the allegedly infringing mark is likely to cause consumer confusion as to the origin or sponsorship of the products to which it is attached." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 168 (2d Cir. 2016) (quotation omitted). As to the first element, "[a] certificate of registration with the Patent and Trademark Office is prima facie evidence that the mark is registered and valid." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). As to the second, the standard for consumer confusion is easily satisfied in the case of counterfeits "because counterfeits, by their very nature, cause confusion." *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 433 (S.D.N.Y. 2012) (quotation omitted).

Both elements are met in this case. Plaintiffs allege that they possess certificates of trademark registration for "WOW WEE" and "FINGERLINGS" for a variety of goods, and attach certificates of those registrations to their complaint. Compl. ¶ 15; Dkt. No. 8-3. And, taking the allegations in Plaintiffs' complaint as true, Defaulting Defendants' products are each virtually identical to one of Plaintiffs' products and incorporate copies or colorable imitations of marks on their product packaging, with only minor variations that no ordinary consumer would recognize. *E.g.*, Compl. ¶¶ 34, 37–39, 51. These allegations are sufficient to support the conclusion that the marks deployed by Defaulting Defendant are counterfeits: the average

purchaser would find the allegedly counterfeit mark to be substantially similar to the registered mark as it appears on the actual merchandise. *See, e.g.*, *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 531–32 (2d Cir. 1983); *Coach*, 908 F. Supp. at 434. On this basis, the Court finds that default judgment on Plaintiffs' first three causes of action are is warranted.

### 2.  Default Judgment on Plaintiffs' Copyright Infringement Claim Is Warranted

To prevail on a claim of copyright infringement, a plaintiff must establish (1) ownership of a valid copyright and (2) infringement of that copyright by the defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 360 (1991). There is a statutory presumption that registered copyrights are valid. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001). To establish infringement, the copyright owner must demonstrate (1) that the defendant has actually copied the owner's work and (2) that the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of the owner's work. *Id.* at 110. Actual copying may be shown by indirect evidence; "[i]f the two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access." *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995). Substantial similarity, in turn, hinges on "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 100 (2d Cir. 1999).

Both elements are met in this case. Plaintiffs allege that they are the owner of U.S. Copyright Registration numbers covering the Fingerlings Monkey, Unicorn, Sloth, and accompanying packaging, and attach their registration certificates to their complaint. Compl. ¶ 13; Dkt. No. 8-2. These allegations suffice to establish the statutory presumption of validity, and are not contradicted by any other allegations or arguments before the Court. For the same

13

reasons that the allegations in Plaintiffs' complaint establish that the products at issue are counterfeits, Plaintiffs have carried their burden of showing actual copying and substantial similarity. Plaintiffs' allegations establish that both the products and the packaging are so strikingly similar as to prove that Defaulting Defendants had access to their products and created works that were substantially similar to Plaintiffs' works. *See* Compl. ¶¶ 37–39; Dkt. No. 8-4. As above, the average lay observer would recognize Defaulting Defendants' alleged copies as being appropriated from Plaintiffs' work. *See* Dkt. No. 8-4.

### 3. Default Judgment on Plaintiffs' New York Business Law Claims Is Not Warranted

Plaintiffs also allege violations of the New York General Business Law's prohibition on deceptive acts and practices and false advertising based upon allegations that Defaulting Defendants' sales and advertising of counterfeit products deceives consumers, the public, and the trade with respect to the source or origin of their products. Compl. ¶¶ 86–95; N.Y. Gen. Bus. Law §§ 349–50. But "[i]t is well settled . . . that infringement claims are not cognizable under these statutes unless there is a specific and substantial injury to the public interest over and above the ordinary trademark infringement or dilution." *Luv N' Care, Ltd. v. Walgreen Co.*, 695 F. Supp. 2d 125, 135 (S.D.N.Y. 2010) (Chin, J.); *see also Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 413 n.2 (S.D.N.Y. 2002) ("[T]he majority [of courts] have held that trademark cases are outside the scope of this general consumer protection statute."). Accordingly, the allegations in Plaintiffs complaint fail to state a claim under either of these sections.

### 4. Default Judgment on Plaintiffs' Common Law Claims is Warranted in Part

Finally, Plaintiffs allege unfair competition and unjust enrichment in violation of New York common law.

To state a claim for unfair competition under New York common law, a plaintiff must allege (1) bad faith (2) misappropriation of the labors and expenditures of another that is (3) likely to cause confusion. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34–35 (2d Cir. 1995). Alleging a likelihood of confusion is sufficient to state a claim for injunctive relief, while to state a claim for damages, Plaintiff must allege actual confusion. *Id.* A plaintiff has carried this burden when it states a Lanham Act claim coupled with a showing of bad faith or intent, *see Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 157 (E.D.N.Y. 2016); and "[u]se of a counterfeit mark creates a presumption of bad faith." *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 599 (S.D.N.Y. 2010) (Sand, J.). Because Plaintiff has made out a Lanham Act claim for use of a counterfeit trademark, these elements are easily met in this action.

Finally, the elements of unjust enrichment under New York law are "(1) defendant was enriched; (2) at plaintiff's expense; and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch, Ltd. v. Phoenix Pictures, Inc.*, 373 F.2d 296, 306 (2d Cir. 2004). But unjust enrichment "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. . . . An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). Accordingly, courts in this circuit frequently dismiss unjust enrichment claims brought in Lanham Act cases. *See, e.g., Boost Worldwide, Inc. v. Talk Til U Drop Wireless, Inc.*, No. 14-CV-86 (MAD), 2014 WL 5026777, at *2 n.2 (N.D.N.Y. Oct. 8, 2014); *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 483–84 (S.D.N.Y. 2014). The same

result is warranted here.

## VI.     Remedies

Having concluded that Plaintiffs have established liability as to their Lanham Act,

copyright, and unfair competition claims, the Court turns next to remedies.  Plaintiff seeks entry

of a permanent injunction, heightened statutory damages, and the post-judgment continuance of

the pre-judgment asset restraint imposed on Defaulting Defendants by the temporary restraining

order and preliminary injunction previously entered in this matter.

### A.     A Permanent Injunction Is Warranted

The Court has authority to grant injunctive relief to prevent further violations of a

plaintiff's trademarks and copyrights.  15 U.S.C. § 1116.  When, as here, a plaintiff has

succeeded on the merits, a permanent injunction is appropriate if the plaintiff has demonstrated

(1) that it suffered an irreparable injury; (2) that remedies available at law are inadequate to

compensate for that injury; (3) that the balance of hardships between the parties warrants a

remedy in equity for the plaintiff; and (4) that the public interest would not be disserved.  *eBay*

*Inc. v. Merc Exchange, LLC*, 547 U.S. 388, 391 (2006); *Salinger v. Colting*, 607 F.3d 68, 77–78

(2d Cir. 2010) (extending the *eBay* standard to copyright actions); *U.S. Polo Ass'n, Inc. v. PRL*

*USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011) (extending the *eBay/Salinger*

standard to trademark infringement actions), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) (summary

order).

All of these factors favor issuing the requested permanent injunction.  "Irreparable harm

exists in a trademark case when the party seeking the injunction shows that it will lose control

over the reputation of its trademark . . . because loss of control over one's reputation is neither

calculable nor precisely compensable.'"  *U.S. Polo Ass'n*, 800 F. Supp. 2d at 540 (quotation and

16

internal quotation marks omitted). Plaintiffs' allegations of loss of goodwill, which are admitted by virtue of Defendants' default, suffice to make this showing. Further, Defaulting Defendants' past conduct raises a likelihood that they will continue to infringe Plaintiffs' intellectual property rights if the preliminary injunction is lifted. The risk of this continued activity establishes the second element: a plaintiff has no adequate remedy at law if, absent an injunction, "the defendant is likely to continue infringing" its intellectual property rights. *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 553 (S.D.N.Y. 2008)

The balance of hardships similarly favors issuing the requested injunction, because "it is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) (quotation omitted). Finally, "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC v. Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

**B.** **Statutory Damages Are Approved**

When the Court enters a default judgment, while it accepts as true all of the factual allegations in the complaint, "the amount of the damages are not deemed true." *Credit Lyonnais Securities (USA) v. Alcantara*, 183 F.3d 151, 152 (2d Cir. 1999). Instead the Court must "conduct an inquiry to ascertain the amount of damages with reasonable certainty." *Id.* Here, Plaintiff submits tiered requests for statutory damages based upon the currently known number of sales of counterfeit products made by the Defaulting Defendants. Br. at 18; *see also* Dkt. No. 81-2. Across tiers, Plaintiffs request heightened statutory damages under the Lanham Act[3] based

---

[3] Plaintiffs elect damages under the Lanham Act "without waiving their claims under the Copyright Act," Br. at 15, and do not address their state law claims. Although some courts have concluded that plaintiffs "are not entitled to duplicative recoveries for the same intellectual property theft under multiple theories of liability," *TU v. TAD Sys. Tech. Inc.*, No. 08-CV-3822 (SLT), 2009 WL 2905780, at *4 (E.D.N.Y. 2009); *see also InduCraft, Inc. v.*

on their allegations that Defaulting Defendants acted willfully. The Court approves Plaintiffs' damages requests with the modifications described below.

The Lanham Act permits plaintiffs to elect statutory damages. 15 U.S.C. § 1117(c). If the Court concludes that the use of the counterfeit mark was willful, Plaintiffs may elect an award not less than $1,000 and not more than $2 million per counterfeit mark per type of good sold or offered for sale. *Id.* "Within these statutory limits courts have considerably broad discretion to balance the punitive, deterrent function of an award against the direction that it not constitute a windfall for prevailing plaintiffs." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 472 F. App'x 19, 22 (2d Cir. 2012) (summary order) (quotation and internal quotation marks omitted). Although the Lanham Act does not itself provide guidelines, courts in this district "have imported from copyright law a multifactor test" that looks to (1) the infringer's profits reaped and expenses saved; (2) the plaintiff's revenues lost; (3) the mark's value; (4) the need to deter potential infringers; (5) the degree of willfulness or the innocence of the defendant; (6) the defendant's cooperativeness in providing information relevant to proof of profits and losses; and (7) the need to deter the defendant from future misconduct. *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 425–26 & n.4 (S.D.N.Y. 2018) (citing *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986) (articulating this standard in the Copyright Act context).

As an initial matter, Plaintiffs are entitled to elect damages from the statutory range applicable to willful infringement. Defaulting Defendants presumptively acted willfully because infringement is deemed willful "by virtue of [a] default." *Tiffany (NJ) v. Luban*, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003). Even in the absence of a default, courts in this district have

---

*Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995) (articulating this theory at a higher level of generality), the Court need not address this question, as Plaintiffs elect statutory damages under the Lanham Act only.

concluded that use of marks that are "virtually identical" to the registered marks renders "inescapable" the conclusion that the defendant's infringement and counterfeiting was intentional. *Coach, Inc. v. Melendez*, No. 10-CV-6178 (BSJ)(HBP), 2011 WL 4542971, at *5 (S.D.N.Y. Sept. 2, 2011), *report and recommendation adopted*, 2011 WL 4542717 (S.D.N.Y. Sept. 30, 2011); *see also Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 854 (2d Cir. 1995).

Turning next to the *Fitzgerald* factors, Defaulting Defendants' failure to appear in this action prevents the Court from ascertaining their profits or the full extent of Plaintiffs' losses, although as a general matter "[c]ourts have supported an inference of a broad scope of operations in cases dealing specifically with websites that ship and sell to a wide geographic range." *Spin Master*, 325 F. Supp. 3d at 426. Of those factors the Court can evaluate, Defendants' noncooperativeness (factor 6), the value of the mark (factor 3), the need to deter other possible infringers (factor 4), and the Defaulting Defendants' willfulness (factor 5) favor a heightened award. On the other side of the balance, because the Court has approved a permanent injunction in this action, specific deterrence (factor 7) does not necessarily militate for a higher award. In analogous cases, armed with "little information as to the scope or consequences of a defendant's infringement," *Ermenegildo Zenga Corp. v. 56th St. Menswear, Inc.*, 06-CV-7827 (HB), 2008 WL 4449533 at *5–6 (S.D.N.Y. Oct.2, 2008), courts in this district have issued awards far below the statutory maximum, ranging in amounts from $25,000 to $50,000 for what are generally "small-scale counterfeiting operations" to up to $1 million when "there was reason to believe that the defendant's sales were substantial"—up to and including "millions of infringing goods," *Tiffany (NJ) LLC v. Dong*, No. 11-CV-2183 (GBD)(FM), 2013 WL 4046380, at *6 (S.D.N.Y. Aug. 9, 2013) (citing examples); *see also Burberry Ltd. v. Euro Moda, Inc.*, No. 08-CV-5781

(CM)(AJP), 2009 WL 4432678, at *5 (S.D.N.Y. Dec. 4, 2009) (similar).

Here, Plaintiffs propose a recovery structure that resembles the landscape of this case law, with statutory damages awards tiered roughly by the number of documented sales made by each Defaulting Defendant. Although Plaintiffs do not cite specific authority for this procedure in other many-defendant cases, the Court approves this tiered structure on the grounds that the tiers likely correspond to the otherwise unaccounted for factors of profit and expense. However, the Court makes the following modifications to bring Plaintiffs' request in line with comparable cases: Plaintiffs are entitled to awards of $50,000 from each Defaulting Defendant in the first tier; $75,000 from each Defaulting Defendant in the second tier; $125,000 from each Defaulting Defendant in the third tier, $250,000 from each Defaulting Defendant in the fourth tier, and $500,000 from each Defaulting Defendant in the final tier. Post-judgment interest shall be awarded on these amounts pursuant to 28 U.S.C. § 1961.

## C.     A Post-Judgment Asset Freeze Is Not Appropriate

Finally, Plaintiffs request that the Court continue the prejudgment asset restraint previously imposed on Defaulting Defendants in the TRO and PI orders. The Court declines to approve this request.

This Court has previously observed that "courts in this district have focused on freezing assets to preserve the equitable remedies of a return of lost profits and an accounting, not statutory damages." *Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 12-CV-6283 (AJN), 2012 WL 4901407, at *2 (S.D.N.Y. Oct. 11, 2012), *supplemented*, 2012 WL 5265727 (S.D.N.Y. Oct. 24, 2012). To conclude otherwise might place those courts in tension with the Supreme Court's holding in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.* that district courts have "no authority to issue a preliminary injunction preventing [a party] from disposing of [its]

assets pending adjudication of [a] contract claim for money damages." 527 U.S. 308, 333 (1999); *see also Klipsch*, 2012 WL 5265727, at *6 ("statutory damages under the Lanham Act are a remedy at law, not one at equity") (collecting cases). The Second Circuit has explicitly approved entry of preliminary injunctions, like the injunction operative in this action, when the plaintiff is pursuing a claim for final equitable relief. *Gucci Am. Inc. v. Bank of China*, 768 F.3d 122, 131 (2d Cir. 2014).

Because Plaintiffs have elected statutory damages, however, there is no basis to continue to maintain an asset freeze designed to facilitate an equitable recovery. As another court in this district explained in a similar posture, the Second Circuit in *Gucci* explicitly cabined its logic to a plaintiff's request for an accounting of profits in the prejudgment context. *Tiffany (NJ) LLC v. QI Andrew*, No. 10-CV-9471 (KPF), 2015 WL 3701602, at *12 (S.D.N.Y. June 15, 2015) (citing *Gucci*, 768 F.3d at 131, and similar cases). Accordingly, that court declined to approve a practice of imposing post-judgment asset freezes. *Id.* The court explained that the ordinary recourse upon securing a money judgment is to look for the remedies available under Federal Rule of Civil Procedure 69 and state law; it was not appropriate to "adopt a reading of a post-judgment asset freeze remedy under Rule 65 that would seemingly subsume the remedies provided by Rule 69 and state law." *Id.* n.9.

The nonbinding authority cited by Plaintiffs does not overcome this logic. Although at least one district court has found post-judgment asset restraint appropriate, *see Tiffany (NJ) LLC v. Forbse*, No. 11-CV-4976 (NRB), 2015 WL 5638060, at *3–4 (S.D.N.Y. Sept. 22, 2015), neither that court nor Plaintiffs explain how the Court could exercise such authority consistent with the logic of *Grupo Mexicano* and the post-judgment enforcement scheme embodied in the Federal Rules. To the extent Plaintiffs are concerned about the risk that Defaulting Defendants

will dispose of, transfer, or hide their assets, it should turn to the remedies ordinarily applicable to enforcement of judgments at law under Rule 69 and N.Y. C.P.L.R. § 5222.

## VII.    Conclusion

For the foregoing reasons, Plaintiffs' motion for entry of default judgment will be GRANTED as to Defaulting Defendants' liability for (1) trademark counterfeiting under the Lanham Act; (2) trademark infringement under the Lanham Act; (3) false designation of origin, passing off, and unfair competition under the Lanham Act; (4) copyright infringement; and (5) common law unfair competition.  Plaintiffs' requests for a permanent injunction and statutory damages are also approved.  The Court declines to enter a post-judgment asset freeze.  The Court will enter a revised version of Plaintiffs' proposed judgment by separate order.

This resolves Docket Number 63.

Dated: March 27, 2019
New York, New York

ALISON J. NATHAN
United States District Judge

2003 WL 1702250
United States District Court,
N.D. Illinois, Eastern Division.

William Henry BARRETT, Plaintiff,
v.
FOX AND GROVE, CHARTERED, Defendant.

No. 01 C 5910.
|
March 28, 2003.

*MEMORANDUM OPINION AND ORDER*

NOLAN, Magistrate J.

**\*1** Plaintiff William Henry Barrett filed suit against defendant Fox & Grove, Chartered ("Fox & Grove") to recover monies allegedly owed him under an ERISA deferred compensation plan (Count 1) and unpaid wages and compensation (Count 2). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is now before the Court on the motions of nine former equity partners of Fox & Grove for leave to intervene in this lawsuit. For the reasons set forth below, the motions are granted.

BACKGROUND [1]

Barrett is a licensed Illinois attorney who worked at the law firm of Fox & Grove until he resigned in December 2000. After his resignation, Barrett started receiving benefits under Fox & Grove's Deferred Compensation Plan (the "Plan"), an ERISA top hat plan maintained "primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(3), 1101(a); *Garratt v. Knowles,* 245 F.3d 941, 946 n. 4 (7th Cir.2001). On March 31, 2001, Fox & Grove ceased its operations, terminated the employment of all of its attorneys, commenced liquidation, and stopped making payments to Barrett under the Plan. As of that date, Barrett was one of eleven Plan participants entitled to benefits.

On August 1, 2001, Barrett filed suit in federal court alleging a state law contract claim for unpaid wages and an ERISA claim based on the firm's (1) failure to pay him any installments of deferred compensation after March 31, 2001, and (2) erroneous calculation of the total value of his deferred compensation account. On May 21, 2002, the directors of Fox & Grove amended the Plan, retroactive to March 31, 2001, to provide that no participant would receive any payment of deferred compensation "until such time as the [Plan] Committee, in its reasonable judgment, decides that all debts of the [firm] other than obligations under the plan have been paid or settled." The directors amended the Plan due to uncertainty about the firm's ability to pay all Plan participants the entirety of their deferred compensation accounts after repaying all outstanding debts, and their determination that no individual participant should receive any payments unless all other participants received a proportionate share.

On or about July 17, 2002, Fox & Grove filed a Motion to Dismiss Barrett's lawsuit, claiming that the retroactive amendment to the Plan defeated his claim for any further payment until the liquidation process was complete. This Court denied that motion on December 2, 2002, finding that (1) the Plan's language permitting amendment "at any time" is ambiguous to the extent that it would allow Fox & Grove to take away vested benefits despite language in the Plan that each participant "shall be entitled" to benefits which "shall be paid" when the participant leaves the firm, Plan §§ 3.1, 5.1, and (2) it is for a factfinder to resolve this ambiguity. *Barrett,* 2002 WL 31761410, at \*4–5. As a result, nine other former equity partners who were participants in the Plan (the "petitioners") now seek leave to intervene in this lawsuit.

DISCUSSION

**\*2** Intervention is the proper mechanism for nonparties to protect interests that may be adversely affected by a trial court's judgment. *Felzen v. Andreas,* 134 F.3d 873, 874 (7th Cir.1998). Fed.R.Civ.P. 24 contemplates two types of intervention: intervention as of right and permissive intervention. A petitioner may intervene as a matter of right by satisfying the following four criteria: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing

2003 WL 1702250, 30 Employee Benefits Cas. 1601

parties to the action." *Reich v. ABC/York–Estes Corp.,* 64 F.3d 316, 321 (7th Cir.1995) (quoting *Shea v. Angulo,* 19 F.3d 343, 344 (7th Cir.1994)); Fed.R.Civ.P. 24(a). A motion to intervene as of right "should not be dismissed unless it appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint." *Reich,* 64 F.3d at 321 (quoting *Lake Investors Development Group, Inc. v. Egidi Development Group,* 715 F.2d 1256, 1258 (7th Cir.1983)). Because rightful intervention cases are highly fact specific they tend to resist comparison to prior cases. *Reich,* 64 F.3d at 321.

Permissive intervention under Rule 24(b) requires a petitioner to show that (1) a common question of law or fact exists; (2) the petition was timely made; and (3) the court has independent jurisdiction over the claims. *Security Insurance Co. of Hartford v. Schipporeit, Inc.,* 69 F.3d 1377, 1381 (7th Cir.1995). The decision to grant or deny a motion for permissive intervention is "wholly discretionary with the district court." *Taco Bell Corp. v. Continental Casualty Co.,* No. 01 C 0438, 2003 WL 124454, at *7 (N.D.Ill. Jan. 13, 2003) (quoting *Keith v. Daley,* 764 F.2d 1265, 1271 (7th Cir.1985)). In exercising this discretion, the court "shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Heartwood, Inc. v. U.S. Forest Service, Inc.,* 316 F.3d 694, 701 (7th Cir.2003) (quoting Fed.R.Civ.P. 24(b)).

In this case, the petitioners claim that they are entitled to intervene in Barrett's lawsuit under both standards. Only Barrett opposes their motions.

A. Intervention as of Right

The petitioners argue that they can intervene as of right because "both the Plaintiff and the Defendant herein are asserting rights in money to which [they] each have an equal right, and the disposition of the instant action may as a practical matter impede [their] ability to protect [their] respective interests." Motions ¶ 13/15. Barrett's primary objection is that the petitioners do not have any interest in the subject matter of the action.

The "interest" required by Rule 24(a) "has never been defined with particular precision." *In re Discovery Zone Securities Litigation,* 181 F.R.D. 582, 593 (N.D.Ill.1998)

(quoting *Security Insurance Co. of Hartford,* 69 F.3d at 1380). A potential intervener's interest must be a "direct, significant, legally protectable one ... It is something more than a mere 'betting' interest, but less than a property right." *In re Discovery Zone,* 181 F.R.D. at 593; *Reich,* 64 F.3d at 322. "In ascertaining a potential intervenor's interest in a case, our cases focus on the issues to be resolved by the litigation and whether the potential intervenor has an interest in those issues." *Reich,* 64 F.3d at 322.

**\*3** Barrett argues that the petitioners do not have any interest in his personal deferred compensation account because they are shareholders of the firm. According to Barrett, the petitioner-shareholders are trying to "reinvent themselves" as creditors to avoid "the corporate law maxim that makes shareholders inferior to creditors when a business dissolves." Barrett says that only he is a true creditor so he has a superior claim to the Plan benefits. Pl. Mem., pp. 4–5. However, nothing in the language of the Plan suggests that shareholder status has any bearing on a participant's eligibility for benefits. To the contrary, the Plan states that any *participant* who "leaves the employ" of the firm will be paid benefits. Plan § 5.1. The Plan also states that participants entitled to receive payments are to be treated as general unsecured creditors of the firm. Plan § 9.2. Like Barrett, the petitioners have left the employ of Fox & Grove, are eligible for benefits under the Plan, and are seeking to assert their rights as Plan participants. 29 U.S.C. § 1132(a)(1)(B). Thus, the Court does not see how the creditor-shareholder distinction is relevant to whether the petitioners have an interest in this lawsuit.

For their part, the petitioners focus on the fact that their right to collect funds under the Plan will be impaired if Barrett is successful in this litigation. If the May 21, 2002 amendment is found to be invalid, then each participant will immediately be entitled to the full value of his or her deferred compensation account. According to the petitioners, however, there will likely not be sufficient funds available to pay each participant in full. Thus, a decision in Barrett's favor would impair the petitioners' ability to recover the monies owed them under the Plan.

The Court is not certain that this provides an adequate basis for intervention as of right in a case involving an unfunded ERISA top hat plan. *See Reich,* 64 F.3d at 322 (intervention under Rule 24(a) is not proper where "a third party who has some outstanding monetary

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 40 of 75 PageID #:2777
Barrett v. Fox and Grove, Chartered, Not Reported in F.Supp.2d (2003)
2003 WL 1702250, 30 Employee Benefits Cas. 1601

claim from one of the parties attempts to intervene to ensure that the outcome of the case preserves as much of its claim as possible"); *Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc.,* 72 F.3d 361, 366 (3d Cir.1995) (mere economic interest in the outcome of litigation is insufficient to support the right to intervene, but "an intervener's interest in a specific fund is sufficient to entitle intervention in a case affecting that fund"); *Reliable Home Health Care, Inc. v. Union Central Insurance Co.,* 295 F.3d 505, 513 (5 th Cir.2002) (an unfunded plan, such as a top hat plan, is "paid solely from the general assets of the employer"); Motions ¶¶ 6, 7 ("because the Plan was unfunded, there were no funds 'earmarked' for distribution to the participants as of March 31, 2001"). Neither the petitioners nor the parties have addressed any of the issues raised by these cases.

**\*4** Nor do the petitioners argue that their status as Plan participants gives them a direct interest in any interpretation of the Plan language or the May 21, 2002 amendment. And they similarly fail to address how a decision in this case on the amendment's validity would affect their right to challenge its validity in a separate lawsuit or to sue for full payment under the Plan. *See, e.g., Shea,* 19 F.3d at 347 (quoting *Meridian Homes Corp. v. Nicholas W. Prassas & Co.,* 683 F.2d 201, 204 (7 th Cir.1982)) ("[i]mpairment exists when the decision of a legal question ... would, as a practical matter, foreclose the rights of the proposed intervenor in a subsequent proceeding"). All the petitioners offer is a conclusory assertion that "disposition of the instant action may as a practical matter impede our ability to protect our respective interests." Motions ¶ 13/15.

In short, the petitioners failed to properly develop their arguments in support of Rule 24(a) intervention, and the Court is under no duty to research and analyze the arguments for them. *See United States v. Amerson,* 185 F.3d 676, 689 (7 th Cir.1999) ("[g]iven our adversarial system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel"). In any event, the Court need not reach this issue because it finds that the petitioners may intervene under Rule 24(b).

## B. Permissive Intervention
As noted, permissive intervention is proper if a common question of law or fact exists, the petition to intervene

was timely made, and there is an independent basis for the court's jurisdiction. *Security Insurance Co. of Hartford,* 69 F.3d at 1381. The parties do not dispute jurisdiction over the petitioners pursuant to 29 U.S.C. § 1132(a)(1)(B), but Barrett argues that (1) there are no common questions involved, (2) the motions are untimely, and (3) he will suffer prejudice and delay if intervention is granted.

### 1. Common Question of Law or Fact
The petitioners argue that "our right to relief arises out of the same series of transactions (i.e., the termination of our employment, the Firm's cessation of operations, and the retroactive Plan amendment) that give rise to the claims already before the court." Motions ¶ 14/16. Barrett claims that "not a single item of evidence will overlap," again focusing on his theory that the petitioners are shareholders while he is a creditor of Fox & Grove. Pl. Mem., p. 7. The Court has finds Barrett's creditor-shareholder theory insufficient to demonstrate an absence of common legal or factual questions. To the contrary, the interpretation of the Plan and its amendment is common to the claims of all Plan participants, including Barrett and the petitioners. And intervention will prevent the petitioners from filing nine separate lawsuits, each requiring a determination regarding the validity of the Plan amendment. *See E.E.O.C. v. Regis Corp.,* No. 99 C 8270, 2001 WL 1911025, at *1 (N.D.Ill. Jan. 17, 2001) ("[t]he purpose of the rule allowing intervention is to prevent a multiplicity of suits where common questions of law or fact are involved"). This, in turn, will help preserve judicial resources and prevent prejudice to the petitioners from the "precedential impact of an unfavorable decision in another lawsuit." *Id.*

### 2. Timeliness
**\*5** Barrett next argues that the petitioners' motions are untimely. The test for timeliness is "essentially one of reasonableness: potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly." *Reich,* 64 F.3d at 321 (citation omitted). In determining whether a petition to intervene is timely, the court must consider four factors: (1) the length of time the intervener knew or should have known of his or her interest in this case, (2) the prejudice to the original party caused by the delay, (3) the resulting prejudice to the intervener if the motion is denied, and (4) any unusual circumstances." *In re Discovery Zone Securities Litigation,*

181 F.R.D. at 594 (quoting *Ragsdale v. Turnock,* 941 F.2d 501, 504 (7th Cir.1991)). Whether a petition is timely presented is within the court's discretion. *United States v. City of Chicago,* 908 F.2d 197, 199 (7th Cir.1990).

In this case, the petitioners claim that a majority of the participants met shortly after the firm ceased operations on March 31, 2001, and out of a sense of fairness, agreed that "all receivables should be applied against the obligations of the Firm to outside creditors before any further distributions of deferred compensation would be made to participants." Motion of Fox et al. ¶ 16. This agreement was confirmed—albeit more than a year later—by the retroactive May 21, 2002 amendment, which was prompted by the directors' uncertainty about the firm's ability to pay all Plan participants after repaying its outstanding debts. When this Court determined that questions of fact exist as to whether the amendment is valid, the petitioners first realized that they needed to intervene in order to protect their respective interests in the Plan funds. *Id.*

The Court finds that the petitioners' motions to intervene are timely. The earliest that the petitioners should have known of their need to intervene was when it became clear that the firm would likely not have sufficient funds to pay all Plan participants. The petitioners did not move to intervene at that time, however, in the belief that the Plan amendment was valid and would protect their interests by ensuring that no individual participant would receive any payments unless all other participants received a proportionate share. There is little case law regarding modification of top hat plans and the Plan does state that it can be amended or terminated "at any time." Plan §§ 8.1, 8.2. Thus, the petitioners were not unreasonable in believing that the Plan amendment was valid and that their interests would be protected, regardless of Barrett's lawsuit. Once the Court determined that the Plan was ambiguous on the issue of amendment, the petitioners first received notice that their rights may not be protected by the amendment, and they requested leave to intervene less than three weeks later.

3. Prejudice or Delay

**\*6** Contrary to Barrett's assertion, allowing the petitioners to intervene will not unduly delay or prejudice these proceedings. Barrett's only claim of prejudice is that he will need extensive discovery on the issue of whether the petitioners are shareholders or creditors. Assuming this is true, any potential prejudice or delay is outweighed by the burden on the petitioners, who would have to bear the expense of filing their own lawsuits and "would likely be burdened by unfavorable rulings in the pending litigation, though they were not parties to it." *Regis Corp.,* 2001 WL 1911025, at \*2. In addition, the petitioners would not be adequately represented by the original parties. Barrett claims that the amendment is invalid and that he is entitled to full payment of his Plan benefits without regard to any other participant. Fox & Grove argues that it will not have sufficient funds to pay all Plan participants and that the valid amendment mandates a pro rata distribution of benefits. Seven of the petitioners agree with Fox & Grove, but two of them claim that the amendment, valid or not, should not apply to them because they left the firm's employ prior to March 31, 2001. Goldman Motion ¶ 11; Blakely Motion ¶ 11. The Court finds that on balance, the original parties would not adequately represent the interests of all petitioners and they should be allowed to intervene in this case. *See Regis Corp.,* 2001 WL 1911025, at \*2 (citing *Jochims v. Isuzu Motors, Ltd.,* 148 F.R.D. 624, 626 (S.D.Iowa 1993)) ("Rule 24 is to be construed liberally with all doubts resolved in favor of permitting intervention").

CONCLUSION

For the reasons stated above, the petitioners' Motions for Leave to Intervene (Docket Entry # 37–1, 38–1, 39–1, 40–1 and 41–1) are granted.

All Citations

Not Reported in F.Supp.2d, 2003 WL 1702250, 30 Employee Benefits Cas. 1601

Footnotes

1    The Court assumes the reader's familiarity with its prior opinion in this case, *Barrett v. Fox and Grove, Chartered,* No. 01 C 5910, 2002 WL 31761410 (N.D.Ill.Dec. 9, 2002), and will not repeat background information unless necessary for an understanding of the pending motions.

**Barrett v. Fox and Grove, Chartered, Not Reported in F.Supp.2d (2003)**

2003 WL 1702250, 30 Employee Benefits Cas. 1601

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 43 of 75 PageID #:2780

Indiana ex rel. Naylor v. Indiana State Teachers Association, Not Reported in Fed....

2010 WL 11569420

2010 WL 11569420
Only the Westlaw citation is currently available.
United States District Court, S.D.
Indiana, Indianapolis Division.

State of INDIANA, EX REL. Chris NAYLOR,
Indiana Securities Commissioner, Plaintiff,
v.

INDIANA STATE TEACHERS ASSOCIATION,
ISTA Insurance Trust, ISTA Financial Services
Corporation, ISTA Welfare Benefits Trust,
ISTA Administrative Services Corporation, and
National Education Association, Defendants.

1:09-cv-1506-SEB-TAB
|
Signed 03/16/2010

**Attorneys and Law Firms**

Alan S. Brown, Joel E. Tragesser, Michele Lorbieski
Anderson, Thomas E. Satrom, Frost Brown Todd LLC,
Indianapolis, IN, for Plaintiff.

Abigail V. Carter, Daniel Zibel, Douglas L. Greenfield,
Jeremiah A. Collins, John M. West, Robert M. Weinberg,
W. Gary Kohlman, Bredhoff & Kaiser P.L.L.C.,
Washington, DC, Alice McKenzie Morical, Andrew
W. Hull, Kimberly L. Cohen, Hoover Hull LLP,
Indianapolis, IN, for Defendants.

**ORDER ON MOTION TO INTERVENE**

Tim A. Baker, United States Magistrate Judge

**I. Introduction**

 *1 Plaintiff State of Indiana by Indiana Securities
Commissioner Chris Naylor sued the Indiana State
Teachers Association, ISTA Insurance Trust, ISTA
Financial Services Corporation, ISTA Welfare Benefits
Trust, ISTA Administrative Services Corporation, and
National Education Association, alleging that they
violated the Indiana Uniform Securities Act and seeking
an asset freeze, accounting, appointment of a receiver/
conservator, and preliminary and permanent injunctions.
[Docket No. 1, Ex. 3 at 1–2.]

Dennis McAllen, Dennis Dittrick, Cheryl Lakes, and
Shirley O'Neil now move to intervene. [Docket No.
28.] All are former or current participants in ISTA
Insurance Trust's long-term disability insurance plans,
and three—Dittrick, Lakes, and O'Neil—are permanently
disabled and receive LTD benefits through the ISTA
Insurance Trust. The proposed intervenors were plaintiffs
in the proposed state class action, *McAllen v. Williams*,
No. 49D05-0907-PL-34768. In *McAllen*, the proposed
intervenors asserted claims against numerous persons and
entities, including ISTA, for "their involvement in the
financial collapse of the ISTA Insurance Trust, which
they allege has left the ISTA Insurance Trust nearly
insolvent and without sufficient funds to pay future LTD
benefits." [Docket No. 29 at 2.] Since the motion to
intervene, *McAllen* has been dismissed. [Docket No. 54.]

The proposed intervenors argue that they are entitled to
intervention under Rule 24(a) (mandatory intervention)
and 24(b) (permissive intervention). [*Id.* at 5–6.] Plaintiff
takes no position on the motion to intervene, but
Defendants oppose intervention. [Docket No. 33, 53.] For
the following reasons, the Court grants the motion as to
Dittrick, Lakes, and O'Neil, but denies the motion as to
McAllen.

**II. Discussion**

*A. Rule 24(c)*
As a preliminary matter, the Court addresses Defendants'
argument that the motion to intervene fails because it
did not comply with Rule 24(c). Rule 24(c) requires
that "[a] motion to intervene must ... state the grounds
for intervention and be accompanied by a pleading that
sets out the claim or defense for which intervention
is sought." Defendants point out—and the proposed
intervenors acknowledge—that no pleading accompanied
the motion to intervene. The proposed intervenors have
since submitted a "Proposed Objection to the Securities
Commissioner's Motion for Appointment of Receiver/
Conservator." [Docket No. 51 at 7, Ex. A.] Because of this
corrective action, the Court will not deny the proposed
intervenors' motion despite its initial failure to comply
with Rule 24(c). *Cf. Mirfasihi v. Fleet Mortgage Corp.*, No.
01 C 722, 2004 WL 2609104, at *2 (N.D. Ill. Nov. 17, 2004)
("Fleet opposes the motion [to intervene] out of the box
because the movants did not accompany their motion with
a pleading. Movants have since filed a pleading, and the
court will not reject the motion on this procedural ground,

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 44 of 75 PageID #:2781

Indiana ex rel. Naylor v. Indiana State Teachers Association, Not Reported in Fed....

2010 WL 11569420

as Fleet has not demonstrated that the tardy filing has prejudiced it.").

*B. Rule 24(a)*

The proposed intervenors argue that they are entitled to intervention as of right under Rule 24(a)(2). That Rule provides:

**\*2 (a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:

\* \* \*

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Intervention as of right is required when proposed intervenors establish: (1) their motion to intervene was timely; (2) they possess an interest related to the subject matter of the action; (3) disposition of the action threatens to impair that interest; and (4) the parties fail to represent adequately that interest. *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773 (7th Cir. 2007). The parties dispute the last three requirements.

1. Protectable interest and threat of impairment

The proposed intervenors identify their interests as continuation of their LTD benefits and protection of the Defendants' limited assets.[1] [Docket No. 29 at 6.] Defendants respond that only three of the four proposed intervenors have an interest in the ongoing receipt of LTD benefits, and it is unclear why an asset freeze would threaten that interest because the Commissioner's request for an asset freeze exempts "the payment of long-term disability claims to disabled teachers entitled to payment under the LTD plan." [Docket No. 1-3 at ¶ 44.]

Even if a receiver were to exempt LTD payments from an asset freeze, the proposed intervenors currently receiving LTD benefits nevertheless have an interest in the fund's assets that disposition of this action could impair. *See Zurich Capital Markets, Inc. v. Cogliese*, 236 F.R.D. 379, 385 (N.D. Ill. 2006) ("While a mere economic interest

may be insufficient to support the right to intervene, an intervenor's interest in a specific fund is sufficient to entitle intervention in a case affecting the fund."). The proposed intervenors presented evidence that the Insurance Trust's annual LTD obligation is expected to reach approximately $9.2 million, but ISTA's annual net revenue (from which it could fund the struggling trust) is expected to be only approximately $4 million. [Docket No. 29, Ex. A at 60, 74.] As the proposed intervenors explained:

**\*3** not only is there a limited fund from which both LTD benefits (the focus of the proposed Intervenors' state court case) and CSR claims (the focus of the present case by the Securities Commissioner) can be paid, the ability of the ISTA Trust, ISTA, and the NEA to pay these claims is inextricably intertwined. Thus, the outcome in this case will have a direct impact on whether the potential Intervenors will continue to receive their LTD benefits payments ....

[Docket No. 29 at 9.]

As mentioned above, the proposed intervenors' state action has been dismissed since they filed their motion to intervene. Defendants argue that this dismissal weighs against intervention. [Docket No. 54.] As the proposed intervenors point out, however, their interest is in the continued receipt of LTD benefits, which is not conditioned on the state action. [Docket No. 55.] Dismissal of the state action, therefore, does not affect the proposed intervenors' interest in this action.

The proposed intervenors have demonstrated that the Insurance Trust has limited funds from which to pay LTD benefits and CSR claims. Disposition of this action could therefore impair the interests of proposed intervenors Dittrick, Lakes, and O'Neil, who currently receive LTD benefits through ISTA Insurance Trust. As a result, these three intervenors possess an interest sufficient for intervention under Rule 24(a).

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 45 of 75 PageID #:2782

Indiana ex rel. Naylor v. Indiana State Teachers Association, Not Reported in Fed....

2010 WL 11569420

The same is not true for proposed intervenor McAllen, who is not currently receiving LTD benefits from the trust. Defendants distinguished McAllen from the other proposed intervenors, but McAllen offered no explanation of his interest. Based on the submissions before it, the Court denies the motion to intervene as to McAllen because it is unclear how he satisfies Rule 24(a), and he appears to be adequately represented by the other three proposed intervenors.

2. Adequate representation

Defendants argue that they adequately represent the proposed intervenors because they share the same interests—avoiding an asset freeze and receivership. The proposed intervenors respond that their interests are not adequately represented by Defendants because "the Defendants and Proposed Intervenors have very different *reasons* for opposing the receivership, and, perhaps more importantly, ... the *consequences* of the receivership for the Defendants and Proposed Intervenors would be very different." [Docket No. 51 at 5.]

Although the parties' interests overlap, their divergent positions as a labor organization and recipients of LTD benefits lead the Court to conclude that the proposed intervenors' interests would not be adequately represented by Defendants. See *Rockies Express Pipeline, LLC v. Ind. State Natural Res. Comm'n*, No. 1:08-cv-1651-RLY-JMS, 2009 WL 395196, at *3 (S.D. Ind. Feb. 17, 2009) ("[A]s [intervenor] Hoosier Hills points out, the [defendant] NRC and Hoosier Hills face very different consequences if [plaintiff] REX prevails in the instant action. While the NRC will lose the authority to continue with its administrative review of the DNR Certificate, Hoosier

Hills will lose any recourse to challenge the construction of REX East and the resulting harm to its aquifer. The court finds that this disparity in potential consequences is sufficient to conclude that the NRC may not adequately represent Hoosier Hills' interest in this action."). As in *Rockies Express*, the mere overlap of the interests of the proposed intervenors and the Defendants does not equate to adequate representation.

*C. Rule 24(b)*

**\*4** Because the Court grants the motion to intervene under Rule 24(a) as to Dittrick, Lakes, and O'Neil, it need not address permissive intervention under Rule 24(b) for these individuals.

As to McAllen, the Court finds that he does not satisfy the requirements of Rule 24(b). He has not identified a claim or defense that shares a common question of law or fact with this action but has instead only generally asserted that his claims and this case are arise from the same events. Moreover, because the state action has been dismissed, McAllen no longer has claims involving the Insurance Trust.

**III. Conclusion**

Because Dennis Dittrick, Cheryl Lakes, and Shirley O'Neil satisfy the requirements of Federal Rule of Civil Procedure 24(a), the Court grants their motion to intervene. [Docket No. 28.] Because Dennis McAllen satisfies neither the requirements of Rule 24(a) nor Rule 24(b), the Court denies the motion to intervene as to him.

**All Citations**

Not Reported in Fed. Supp., 2010 WL 11569420

---

Footnotes

1    The proposed intervenors also assert an interest in protecting an order entered in the Marion County action appointing nine trustees to replace the single trustee who had been operating the trust. The proposed intervenors argue that if the nine trustees are replaced by a receiver, the organizations financially supporting the trust may withdraw their support because of a lack of confidence in the receiver. [Docket No. 29 at 3.] However, the only support the proposed intervenors offer for this scenario is a citation to an unsupported statement in ISTA's motion for reconsideration of the state court order. [*Id.*] Under these circumstances, the possibility that organizations will remove their support is too remote to permit the proposed intervenors' interest in the state court order to qualify as an interest requiring intervention.

---

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3818622

2015 WL 3818622
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Luxottica USA LLC, Plaintiff,
v.
The Partnerships and Unincorporated Associations
Identified On Schedule "A", Defendants.

Case No. 14 c 9061
|
Signed June 18, 2015

**Attorneys and Law Firms**

Kevin W. Guynn, Amy Crout Ziegler, Jessica Lea
Bloodgood, Paul G. Juettner, Justin R. Gaudio, Greer,
Burns & Crain, Ltd., Chicago, IL, for Plaintiff.

Lingzhi Zhao, Zhao & Associates, P.C., Michael J.
Robins, Robins & Associates LLC, Chicago, IL, for
Defendants.

## *MEMORANDUM OPINION AND ORDER*

Harry D. Leinenweber, Judge, United States District
Court

**\*1** This case arises from the unauthorized sale of
counterfeit Ray–Ban eyewear through various online
seller accounts. Default judgment has been entered against
most Defendants, while others have been voluntarily
dismissed. A single Defendant ("Defendant"), who has
been identified by two eBay seller IDs, remains.

Before the Court is Plaintiff Luxottica USA LLC's
("Luxottica") Motion for Summary Judgment, Statutory
Damages of $450,000, Permanent Injunction, and
Attorneys' Fees and Costs [ECF No. 77]. For the reasons
stated herein, Luxottica's Motion is granted, except that
the Court awards statutory damages in the amount of
$150,000.

## I. *BACKGROUND*

Luxottica is the exclusive wholesale distributor of genuine
Ray–Ban products in the United States and holds
the exclusive right to enforce RAY–BAN trademarks
within the United States. (Joint Stmt. of Stipulated
Facts, ECF No. 75, ¶ 1.) RAY–BAN marks have been
used continuously and exclusively by Luxottica and its
predecessors since as early as 1937. (*Id.* ¶ 3.) Luxottica has
protected the value of the Ray–Band brand by registering
the following trademarks with the United States Patent
and Trademark Office: Reg. No. 1,080,886, Reg. No.
1,320,460, Reg. No. 3,522,603. (*Id.* ¶ 1.)

Defendant stipulates that up until November 2014,
it sold and offered for sale knockoff products
featuring counterfeit RAY–BAN trademarks via online
marketplace accounts associated with the eBay seller
IDs "g7178a" and "qhgypchyh2." (*Id.* ¶¶ 5– 8.) (The
introductory paragraph of the parties' joint statement of
stipulated facts refers to the seller IDs as "g7178" and
"qhgypchyh.") Defendant has stipulated to owning the
online marketplace accounts associated with these seller
IDs, as well as seven PayPal accounts associated with
various email addresses. (*Id.* ¶ 4.) Defendant sold at least
106 counterfeit Ray–Ban products at prices ranging from
$6.29 to $6.99 each. (*Id.* ¶ 5.)

## II. *ANALYSIS*

Luxottica requests that this Court (1) enter summary
judgment in its favor on the two claims asserted against
Defendant, (2) award statutory damages of $450,000
pursuant to 15 U.S.C. § 1117(c), (3) enter a permanent
injunction against Defendant and transfer to Luxottica
all assets currently restrained in PayPal accounts that are
connected to Defendant, and (4) award attorneys' fees and
costs pursuant to 15 U.S.C. § 1117(a)–(b).

### A. Summary Judgment

Luxottica argues that it is entitled to summary judgment
on its claims for false designation of origin under the
Lanham Act, 15 U.S.C. § 1125(a), and violation of the
Illinois Uniform Deceptive Trade Practices Act, 815 ILCS
§ 510, *et seq.* Summary judgment is appropriate when
"there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of
law." FED. R. CIV. P. 56(a). Defendant has already

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 1

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 47 of 75 PageID #:2784

Luxottica USA LLC v. The Partnerships and Unincorporated..., Not Reported in...

2015 WL 3818622

admitted liability on the above-mentioned counts in a Joint Statement of Stipulated Facts filed with the Court on April 7, 2015. (ECF No. 75 ¶¶ 6–8 ("Defendant knowingly and willfully offered for sale and sold at least one hundred six (106) Counterfeit Ray–Ban Products.... Defendant admits liability for false designation of origin using counterfeit trademarks and violation of the Illinois Uniform Deceptive Trade Practices Act.").) Summary judgment is therefore entered in favor of Luxottica.

### B. Statutory Damages

**\*2** Luxottica seeks a total damages award of $450,000 — $150,000 for each of the three trademarks that Defendant used on the counterfeit products. Defendant argues that statutory damages of no more than $7,440 are appropriate because it generated only $800 in total revenue from the sale of the counterfeit goods, and only a fraction of that amount within the United States.

Under 15 U.S.C. § 1117(c), a plaintiff in a case involving the use of a counterfeit mark may elect to recover an award of statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed" or, in the case of willful infringement, "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed." Although the Lanham Act permits a plaintiff to choose either actual or statutory damages, statutory damages are "most appropriate" when an infringer's nondisclosure makes actual damages uncertain. *Sara Lee Corp. v. Bags of N. Y., Inc.,* 36 F.Supp.2d 161, 165 (S.D.N.Y.1999).

Though § 1117(c) places a dollar range on possible statutory damages awards, the statute provides no guidance on how to select a figure within that range. *Lorillard Tobacco Co. v. S & M Cent. Serv. Corp.,* No. 03 C 4986, 2004 WL 2534378, at \*4 (N.D.Ill. Nov. 8, 2004). Accordingly, "[c]ourts interpreting section 1117(c) have looked by analogy to case law applying the statutory damage provision of the Copyright Act contained in 17 U.S.C. § 504(c)." *Id.*

The Seventh Circuit's standard for the award of statutory damages in copyright infringement cases is set forth in *Chi–Boy Music v. Charlie Club, Inc.,* 930 F.2d 1224, 1229 (7th Cir.1991). Under *Chi–Boy,* "district courts

enjoy wide discretion in awarding fees and may consider various factors such as [1] the difficulty or impossibility of proving actual damages, [2] the circumstances of the infringement, and [3] the efficacy of the damages as a deterrent to future copyright infringement." *Id.* at 1229– 30 (citation and internal quotations omitted). Courts have also considered the value of a plaintiff's brand, "and the efforts taken to protect, promote, and enhance that brand." *Lorillard,* 2004 WL 2534378, at \*6. Ultimately, § 1117(c) looks to both "compensatory considerations" such as "actual losses and trademark value," as well as "punitive considerations" such as "deterrence of other infringers and redress of wrongful defense conduct." *Sara Lee,* 36 F.Supp.2d at 165; see also, *Sands, Taylor & Wood v. Quaker Oats Co.,* 34 F.3d 1340, 1347 (7th Cir.1994) (noting that statutory damages under § 1117(c) are not merely remedial but serve an important public interest), *modified on reh'g in part,* 44 F.3d 579 (7th Cir.1995).

The Court turns first to compensatory considerations. Although there is "no necessary mathematical relationship between the size of [a statutory damages award] and the extent or profitability of the defendant's wrongful activities," *Sara Lee,* 36 F.Supp.2d at 165, statutory damages must "bear some relation" to actual damages, *Coach, Inc. v. Tom's Treasure Chest,* No. 2:10– CV–00243, 2011 WL 4399355, at \*3 (N.D.Ind. Sept. 21, 2011) (citation and internal quotations omitted). Courts may look to the size and scope of a defendant's operations to determine a baseline for damages. *Id.* High statutory damages may be appropriate when counterfeiting activities take place online and are capable of reaching a wide audience. *Id.*

**\*3** Here, Defendant argues that "the parties have a complete record of *all* the sales of the accused products"— namely, PayPal records documenting Defendant's sales, which totaled approximately $800 worldwide and $372 in the United States. (Def.'s Resp., ECF No. 82, at 11.) Plaintiff counters that Defendant's evidence—which was submitted without a declaration—is unauthenticated and contains contradictory information. For instance, the figures displayed on the webpages for Defendant's eBay storefronts indicate that Defendant sold more than 200 pairs of sunglasses, (see, Ex. 2 to Joint Stmt. of Stipulated Facts, ECF No. 75–2), but the PayPal figures Defendant submits show only 106 pairs of sunglasses sold. (Def.'s Resp., ECF No. 82, at 5.) While the parties dispute the exact sales figures, no evidence submitted suggests that

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 48 of 75 PageID #:2785

Luxottica USA LLC v. The Partnerships and Unincorporated..., Not Reported in...

2015 WL 3818622

Defendant is a large-scale counterfeiter. For instance, all seven PayPal accounts that have been "connected" to Defendant contain only $75,000. (*See, id.* at 2–3.)

On the other hand, Defendant's counterfeiting took place on the Internet, enabling Defendant to reach a "vast customer base," *Burberry Ltd. & Burberry USA v. Designers Imports, Inc.,* No. 07 CIV. 3997(PAC), 2010 WL 199906, at *10 (S.D.N.Y. Jan. 19, 2010), and making Luxottica's actual losses difficult to calculate, *Brown v. Walker,* No. 1:06–CV–218, 2010 WL 2346242, at *7 (N.D.Ind. May 25, 2010), *report and recommendation adopted as modified,* No. 1:06–CV–218–TLS, 2010 WL 2346225 (N.D. Ind. June 9, 2010). In cases involving the online sale of counterfeit goods, courts have found substantial damages awards appropriate. *See, e.g., id.* (awarding $50,000 per mark); *Burberry,* 2010 WL 199906, at *10 (awarding $100,000 per mark); *Deckers Outdoor Corp. v. Does 1–55,* No. 11 C 10, 2011 WL 4929036, at *5 (N.D.Ill. Oct. 14, 2011) (awarding $750,000 per mark). In this case, the Court has already awarded damages of $2 million against each defaulting Defendant. (*See,* ECF No. 65 ¶ 4.)

In addition, the RAY–BAN marks are well known and highly valuable. As noted, Luxottica and its predecessors have used the RAY–BAN marks continuously and exclusively since as early as 1937, and the marks at issue in this lawsuit are all federally registered. Luxottica submits that it expended significant resources in promoting the Ray–Ban brand, making Ray–Ban the "undisputed world leader in the field of sun and prescription eyewear." (Pl.'s Mem., ECF No. 78, at 10.) Luxottica has also filed numerous lawsuits within this District in an effort to protect the RAY–BAN marks and their associated goodwill. (*See, id.* at 11 n.6.)

The Court now turns to punitive considerations. "[P]art of the purpose of statutory damages is to deter the current violator and other potential future violators." *Lorillard,* 2004 WL 2534378, at *6. Damages awards limited to lost profits are typically ineffective deterrents because "[a] counterfeiter must fear more than just having to turn over his ill-gotten gains to the rightful owners." *Id.* Here, Defendant has stipulated that it engaged in willful infringement. However, Defendant has also mitigated the degree of willfulness by ceasing the sale of the counterfeit products immediately, retaining an attorney, and voluntarily providing information to Luxottica.

Because this is not a case of default, and based on the mitigating factors identified above, the Court finds it appropriate to reduce the statutory damages Luxottica seeks by two-thirds. Pursuant to 15 U.S.C. § 1117(c), the Court awards Luxottica statutory damages in the amount of $50,000 per mark, for a total award of $150,000.

### C. Permanent Injunction

Luxottica seeks permanent injunctive relief pursuant to 15 U.S.C. § 1116(a), which enables district courts to grant injunctions, "according to the principles of equity and upon such terms as the court may deem reasonable." A plaintiff seeking a permanent injunction must demonstrate the following:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

 *\*4* *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006); *accord e360 Insight v. The Spamhaus Project,* 500 F.3d 594, 604 (7th Cir.2007).

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook,* 272 F.3d 424, 432 (7th Cir.2001). As this Court recognized in granting Luxottica's Motion for a Temporary Restraining Order and Preliminary Injunction, counterfeiting has eroded consumer goodwill in the RAY–BAN trademarks and constitutes irreparable harm for which there is no adequate remedy at law. Further, because Defendant's conduct was willful, the balance of hardships favors Luxottica. *See, Bulgari, S.p.A. v. Partnerships & Unincorporated Associations Identified*

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 49 of 75 PageID #:2786

Luxottica USA LLC v. The Partnerships and Unincorporated..., Not Reported in...

2015 WL 3818622

*On Schedule "A",* No. 14–CV–4819, 2014 WL 3749132, at *6 (N.D.Ill. July 18, 2014), *report and recommendation adopted,* No. 14 CV 4819, 2014 WL 3765854 (N.D.Ill. July 29, 2014). The public interest also favors Luxottica, because "enforcement of the trademark laws prevents consumer confusion," *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469 (7th Cir.2000), and consumers have a legitimate "interest in knowing with whom they do business." *Re/Max N. Cent.,* 272 F.3d at 433.

As part of the injunction, Luxottica seeks the immediate transfer of "all assets in financial accounts operated by PayPal, Inc. and linked to Defendant, as well as any newly discovered assets, to Luxottica." (Pl.'s Mem., ECF No. 78, at 12.) In granting Luxottica's Motion for Preliminary Injunction, the Court previously froze assets held in accounts "connected" to Defendant on the basis that Luxottica sought an accounting of profits as an alternative to statutory damages. *See, CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir.2002) (upholding asset freeze where plaintiff sought accounting in the alternative to statutory damages). Now, relying on the PayPal records, Defendant argues that the asset freeze is too broad, sweeping up accounts "wholly unrelated to the accused products." (Def.'s Resp., ECF No. 82, at 8.) Defendant urges the Court to scale back the asset freeze to $7,440, an amount it contends is "more than adequate to satisfy the Court's interests in preserving any equitable accounting of profits." (*Id.* at 10.)

In arguing that the asset restraint should be modified, Defendant relies on *Klipsch.* In *Klipsch,* after a preliminary injunction hearing in which a defendant submitted evidence that it had only sold a few thousand dollars' worth of counterfeit goods, a court reduced a prejudgment asset restraint from $2 million to $20,000. *Klipsch Grp., Inc. v. Big Box Store Ltd.,* No. 12 CIV. 6283 AJN, 2012 WL 5265727, at *3 (S.D.N.Y. Oct. 24, 2012). The court held that, under the Supreme Court's ruling in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999), asset freezes are limited to preserving the equitable remedy of an accounting for profits. *Klipsch,* 2012 WL 5265727, at *3.

**\*5** To exempt assets from an asset freeze, "[t]he burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of counterfeiting activities." *N. Face Apparel Corp. v. TC Fashions, Inc.,* No. 05 CIV. 9083(RMB), 2006 WL 838993,

at *3 (S.D.N.Y. Mar. 30, 2006) (citation and internal quotations omitted). Defendant claims that only two of Defendant's seven PayPal accounts contain any profits related to the sale of counterfeit Ray–Ban goods. In support of this argument, Defendant has submitted a spreadsheet of transactions associated with one of Defendant's email addresses, as well as an untranslated Chinese email. (*See,* Exs. K & L to Def.'s Resp., ECF No. 82–1.) To rule out the five remaining accounts, Defendant has submitted PayPal account summaries it claims show no connection to the eBay Seller IDs "g7178a" and "qhgypchyh2." (*See,* Exs. C–I to Def.'s Resp., ECF No. 82–1.) Defendant has also provided several hundred pages of eBay feedback ratings associated with the two seller IDs, showing that it sold a variety of products in addition to sunglasses. (*See,* Ex. N to Def.'s Resp., ECF No. 82–1.)

Luxottica, however, disputes the authenticity and validity of this evidence. For instance, Luxottica notes that the evidence was not accompanied by a declaration, that the transaction spreadsheet does not identify the quantity of glasses sold, and that Defendant's sales figures contradict information displayed on the eBay storefronts. Despite Defendant's contention that it is unconnected to five of the seven PayPal accounts, Defendant has admitted to owning the PayPal accounts associated with the email addresses shown in the account summaries. (Joint Stmt. of Stipulated Facts, ECF No. 75, ¶ 5.) Luxottica submits that the restraint on these accounts "was based on PayPal, Inc.'s ... determination through PayPal's proprietary methods, which have not been disclosed to Luxottica or Luxottica's counsel." (Gaudio Decl, Ex. 1 to Pl.'s Reply, ECF No. 84–1, ¶ 2.)

The Court cannot conclude, based on the evidence before it, that Defendant has met its burden in showing that the asset restraint should be limited to only a portion of two of the seven PayPal accounts and declines to modify the asset restraint on this basis.

## D. Attorneys' Fees and Costs

Finally, Luxottica seeks an award of attorneys' fees and costs. As the prevailing party, Luxottica is entitled to costs under Federal Rule of Civil Procedure 54(d)(1). Under 15 U.S.C. § 1117(a), which addresses recovery in terms of profits and actual damages, a court may, "in exceptional cases ... award reasonable attorney fees to

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 50 of 75 PageID #:2787

Luxottica USA LLC v. The Partnerships and Unincorporated..., Not Reported in...

2015 WL 3818622

the prevailing party." Exceptional cases include those in which a defendant's conduct is willful. *BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081, 1099 (7th Cir.1994). In assessing damages under § 1117(a), courts "shall" award attorneys' fees, absent extenuating circumstances, in cases involving the intentional use of a counterfeit mark. 15 U.S.C. § 1117(b). An award of attorneys' fees is available where, as here, a plaintiff "opt[s] to receive statutory damages under section 1117(c)." *Louis Vuitton Malletier S.A. v. LY USA, Inc.,* 676 F.3d 83, 111 (2d Cir.2012); *accord Coach, Inc. v. Treasure Box, Inc.,* No. 3:11CV468–PPS, 2014 WL 888902, at *5 (N.D.Ind. Mar. 6, 2014). Accordingly, and in light of Defendant's willful counterfeiting, Luxottica is awarded reasonable attorneys' fees and costs in an amount to be determined by the Court.

### III. *CONCLUSION*

For the reasons stated herein, Luxottica's Motion for Summary Judgment and Statutory Damages is granted in part and denied in part.

The Court enters summary judgment in favor of Luxottica and against Defendant. Pursuant to 15 U.S.C. § 1117(c), the Court awards Luxottica $150,000 in statutory damages. The Court also awards Luxottica reasonable attorneys' fees and costs, and will enter a permanent injunction prohibiting Defendant from violating Luxottica's rights in the RAY–BAN marks.

Within seven (7) days of the entry of this order, Luxottica shall submit a revised Final Judgment Order consistent with this opinion. The parties are to attempt to reach an agreement on the issue of attorneys' fees in accordance with Local Rule 54.3. If an agreement cannot be reached, Luxottica is to file a Motion for Attorneys' Fees within thirty (30) days of the entry of this Order.

**\*6  IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3818622

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 838993
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

THE NORTH FACE APPAREL CORP., a
Delaware corporation; PRL USA Holdings, Inc.,
a Delaware corporation; and Polo Ralph Lauren
Corporation, a Delaware corporation, Plaintiffs,
v.
TC FASHIONS, INC., d/b/a SDT USA d/b/a EB
Garments d/b/a Cheers Enterprises d/b/a Great
Champion Trading d/b/a J & C International d/
b/a Combi Fashions d/b/a Jr & Pepper d/b/a
Garment Closeout.com, a New York corporation;
SDT USA, Inc. a/k/a Sung Dong Trading Company,
a New York corporation; Margaret Scott, an
individual; Christine Yuen a/k/a Suek Peng
Yoon, an individual; Yvonne Chan, an individual;
Todd Turner, an individual; Wing Yee MA a/
k/a Anna MA, an individual; Hiu Man Lee,
an individual; Ling Ling Lee, an individual;
Robert Holt, an individual; Waitex International
Co. Ltd ., d/b/a Fashion USA a New York
Corporation; Emmy Fashions, Inc., a corporation;
Great Value, Inc., a New York corporation; EB
Garments, Inc., a New York corporation; John
Does 9–30 and XYZ Corps. 5–30, Defendants.

No. 05 Civ. 9083(RMB).
|
March 30, 2006.

*DECISION & ORDER*

BERMAN, J.

I. Background

**\*1** On or about October 24, 2005, The North Face
Apparel Corp. ("North Face"), and PRL USA Holdings,
Inc. and Polo Ralph Lauren Corp. ("PRL USA")
(collectively, "Plaintiffs") filed under seal a complaint
("Complaint") alleging that Defendants TC Fashions,
Inc. ("TC Fashions" or "TC"), EB Garments, Inc.
("EB Garments"), SDT USA, Inc. ("SDT USA" or
"SDT"), "JOHN DOES 1–5 and XYZ CORPS. 1–15"

"used, reproduced and/or copied Plaintiffs' [trademarks]
in connection with their manufacturing, distributing,
exporting, importing, advertising, marketing, selling
and/or offering to sell counterfeit copies of Plaintiffs'
Products" in violation of Sections 32(1) and 43(a) and
(c) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a)
& (c). [1] (Complaint ¶ 28.) At the same time, Plaintiffs
applied, *ex parte,* for a temporary restraining order,
seizure order, asset restraining order, expedited discovery
order, and order to show cause for preliminary injunction
pursuant to 15 U.S.C. § 1116(d) ("*Ex Parte* Application").
(*See* Plaintiff's Memorandum of Law, dated October 24,
2005.)

On October 25, 2005, the Court granted Plaintiffs' *Ex
Parte* Application pursuant to 15 U.S.C. § 1116(d). (Order
Granting Plaintiffs' *Ex Parte* Application for Temporary
Restraining Order, Seizure Order, Asset Restraining
Order, Expedited Discovery Order, and Order to Show
Cause for Preliminary Injunction, dated October 25, 2005
("TRO").) [2] Among other things, the TRO authorized
the seizure of allegedly counterfeit products located at
"499 7th Avenue, 6th Floor, in New York, New York,
10018," "Waitex Warehouse, 1800 Lower Road, Linden,
New Jersey 07036," and "2001 Tonnelle Avenue, North
Bergen, New Jersey 07047." (TRO at 5.)

Plaintiffs executed the TRO on October 27 and 28,
2005, (Declaration of David Saenz, dated November
7, 2005 ("Saenz Decl.") ¶ 2; Declaration of W.K.
Wong, dated November 4, 2005 ("Wong Decl.") ¶ 8),
recovering "more than twenty eight thousand counterfeit
POLO RALPH LAUREN shirts and seven thousand
counterfeit THE NORTH FACE jackets stored [by
TC Fashions] at Waitex's warehouse in Linden, New
Jersey." (Supplemental Declaration of G. Roxanne
Elings, dated November 7, 2005 ("Elings Supp. Decl.")
¶ 16; Reply Memorandum of Law in Support of Asset
Restrain and Order to Show Cause for Preliminary
Injunction, dated November 7, 2005 ("Pl.Reply"), at 2; *see
also* Declaration of Christine Yuen, dated November 4,
2005 ("Yuen Decl.") ¶¶ 11 ("The North Face goods seized
at the Waitex warehouse, were not sold, they had just only
been purchased, [and] were obviously fake."), 12 ("I am
advised that goods impounded at the Waitex warehouse
were counterfeit Polo items.").)

On or about November 4, 2005, Plaintiffs filed an
amended complaint ("Amended Complaint") identifying

several previously anonymous defendants, including, among others, Christine Yuen ("Yuen") and Waitex International Co. Ltd. ("Waitex"). (Amended Complaint ¶¶ 8, 15.) Plaintiffs allege that Yuen "is the owner of TC [and] actively manages and participates in TC's counterfeiting business" and "Waitex stores counterfeit goods on behalf of TC and SDT, and assists in re-labeling and re-packaging such counterfeit goods." (*Id.*)

**\*2** Also, on or about November 4, 2005, Defendants TC Fashions, Great Value, Inc. ("Great Value"), EB Garments, and Yuen, the sole shareholder of those corporations (collectively, "TC Defendants"), and Waitex submitted a response to Plaintiffs' *ex parte* seizure and application for a preliminary injunction. (*See* Defendants' Memorandum of Law in Response to Plaintiffs' *Ex Parte* Seizure and Request for a Preliminary Injunction, dated November 4, 2005 ("Def.Mem.").) Plaintiffs filed a reply on or about November 7, 2005. (*See* Pl. Reply.) On or about November 30, 2005, Waitex filed a sur-reply, (*see* Waitex's Sur-Reply Memorandum of Law, dated November 30, 2005 ("Waitex Sur–Reply")), and Yuen submitted a Sur–Reply Declaration, dated November 30, 2005 ("Yuen Sur–Reply Decl."). Plaintiffs filed a "sur-sur reply" on or about December 7, 2005. (*See* Plaintiffs' Sur–Sur Reply Memorandum of Law in support of Order to Show Cause for Preliminary Injunction, dated December 7, 2005 ("Pl. Sur–Sur Reply").)

Plaintiffs seek to convert the TRO into a preliminary injunction. (Pl. Reply at 3–8.) TC Defendants state that they are "consenting to the preliminary injunction" but also seek to have certain restraints on their assets "modified." (Def. Mem. at 2 (emphasis in original).) SDT has not appeared in this action. Waitex opposes any preliminary injunction against it, seeks to have restraints on its assets removed, and seeks a protective order concerning information contained in documents and computers seized by Plaintiffs. (*Id.* at 6–9, 11–13.)

## II. Legal Standard
"To obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor. *Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 537 (2d Cir.2005) (quoting *Federal*

*Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 173 (2d Cir.2000)). "In trademark disputes, 'a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm.' " *Malletier,* 426 F.3d at 537 (quoting *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988)); *see also In re Vuitton et fils S.A.,* 606 F.2d 1, 4 (2d Cir.1979) (purpose of counterfeit goods "is to confuse the buying public into believing it is buying the true article").

## III. Analysis

### A. *TC Defendants*

#### 1. Preliminary Injunction
As noted, TC Defendants consent to a preliminary injunction. (*See* Def. Mem. at 2, 5.) The parties are directed to meet and confer forthwith and jointly to submit to the Court a proposed preliminary injunction for the Court's endorsement on or before April 6, 2006. [3]

#### 2. Restrained Assets
**\*3** TC Defendants assert that they "have had more than a million dollars in their bank accounts restrained," and that these restraints should be "modified" because only a portion of that money is derived from the sale of garments bearing Plaintiffs' trademarks. [4] (*See* Def. Mem. at 11.) While the TC Defendants collectively initially argued that "a restraint of $175,000 should be more than adequate," (Def. Mem. at 11; *see also* Yuen Decl. ¶ 13 ("I am prepared to deposit an appropriate sum of money— which I believe to be $175,000 about 50% more than the sales of the North Face goods")), Yuen later explained that gross profits from the sale of garments bearing Plaintiffs' trademarks totaled $235,724 .40. (Yuen Sur–Reply Decl. ¶ 6.) TC Defendants argue that Plaintiffs have miscalculated TC's profits because "the plaintiffs' version of the accounting for gross profit includes [among other things] alleged profits from the sale of merchandise that was in fact confiscated by the plaintiffs" and does not take into account costs "such as warehousing, credit card and factor commissions, as well as sales commissions." (*See* Yuen Sur–Reply Decl. ¶ 3.) TC Defendants also assert that "one of the bank accounts restrained by the plaintiffs contain funds that were the direct proceeds of sales of commonly-held securities that were purchased in the year 2000 and sold in September [2005]. None of the funds contained in that account have any connection to the sale

of goods at issue in this action." (Yuen Sur–Reply Decl. ¶ 7; *id.* Ex. G.)

Plaintiffs argue that TC's profits from the sale of counterfeit garments bearing Plaintiffs' trademarks for 2004 and 2005 alone totaled over $1.3 million. (Elings 2d Supp. Decl. ¶¶ 3–4 & Ex. B .) [5] Plaintiffs assert that "on the day of Plaintiffs' execution of the TRO alone, TC Fashions had more than twenty eight thousand counterfeit POLO RALPH LAUREN shirts and seven thousand counterfeit THE NORTH FACE jackets stored a Waitex's warehouse in Linden, New Jersey." (Pl. Reply at 9 (citing Elings Supp. Decl. ¶ 16).) Plaintiffs also have submitted evidence suggesting that Yuen used bank accounts located in Hong Kong for her business. (Elings Supp. Decl. Ex. L; *see* Elings 2d Supp. Decl. ¶ 5 ("Without a full accounting by TC Fashions Defendants to this Court, Plaintiffs submit that TC Fashions Defendants have not made a sufficient showing to have any funds restrained by the TRO released.").)

District courts have the "authority to freeze those assets which could [be] used to satisfy an equitable award of profits." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995) (citing *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.,* 970 F.2d 552, 558–59 (9th Cir.1992)); *see also* 15 U.S.C. § 1117(a) (as remedy for violation of 15 U.S.C. § 1125(a) (false designation of origin) "the plaintiff shall be entitled, ... subject to the principles of equity, to recover [among other things] defendant's profits"); *McCarthy on Trademarks and Unfair Competition § 30:40* (4th ed.) (purpose of freezing assets is to preserve "security for plaintiff's future recovery on an accounting of the counterfeiter's profits."). The Court may "exempt any particular assets from the freeze on the ground that they [are] not linked to the profits of allegedly illegal activity." *Levi Strauss & Co.,* 51 F.3d at 987. The burden is on the party seeking relief to "present documentary proof that particular assets [are] not the proceeds of counterfeiting activities." *See Cartier Int'l B.V. v. Liu,* No. 02 Civ. 7936, 2003 WL 1900852, at *1 (S.D.N .Y. Apr. 17, 2003).

**\*4** On the instant record, it is not clear whether any particular portion of TC Defendants' frozen assets are "not the proceeds of counterfeiting activities." [6] *See Liu,* 2003 WL 1900852, at *1. Yuen has submitted spreadsheets indicating that, after certain adjustments, TC's gross profits (apparently in 2004 and 2005) were $220,278.60

from the sale of PRL USA goods and $15,445.80 from the sale of North Face goods. (Yuen Sur–Reply Decl. Exs. A & F.) Yuen's spreadsheets indicate that TC's profits from the sale of North Face goods arose solely from commissions TC made from selling North Face goods on behalf of SDT. (Yuen Sur–Reply Decl. Ex. F ("Commission Received from SDT USA on North Face Sales"; "Good[s] owned by SDT USA, Inc. not TC Fashions, Inc. TC Fashions, Inc. only receive[d] commissions on Goods Sold.").)

Plaintiffs, on the other hand, have submitted spreadsheets indicating that TC's gross profits in 2004 and 2005 were $977,779.60 from the sale of PRL USA goods and $346,180 from the sale of North Face goods. (Elings 2d Supp. Decl. Ex. B.) Plaintiffs support their profit calculation for the sale of PRL USA goods with packing lists and sales slips. (*Id.*) The evidence of TC's sales of North Face goods, however, appears to indicate that at least a portion of revenue from sales was being collected by SDT and not TC. (*Id.*) And, there appears to be some question as to whether SDT and TC are separate entities. (*See* Letter Agreement between CIT Commercial Services and TC, dated September 2005, Elings 2d Supp. Decl. Ex. A ("It is understood and agreed that the Agreement covers all of your sales, including but not limited to sales of your inventory made by you under your name and under all of your trade names ... including, but not limited to the following: S.D.T. USA").

Final resolution of these issues requires further evidentiary submissions and possibly witness testimony. The parties are directed to meet and confer forthwith in an effort to reach their own agreement and to submit a joint letter to the Court by April 6, 2006 indicating whether they have been successful. If they are unable to reach agreement, the Court may refer the matter to Magistrate Judge Kevin Nathaniel Fox for a hearing. [7]

### B. *SDT*

SDT has not appeared in this action and "has submitted no papers in opposition to Plaintiffs' requested preliminary injunction." (Pl. Reply at 3.) And, the evidence in the record to the effect that SDT manufactured and/or supplied TC with many of the counterfeit garments at issue is uncontradicted and sufficient to support a preliminary injunction. (*See, e.g.,* Elings Supp. Decl. Exs. A, B & G; Yuen Decl. Ex. A); *see Gucci Am.,*

*Inc. v. Duty Free Apparel, Ltd.,* 286 F.Supp.2d 284, 287 (S.D.N.Y.2003) ("For both Lanham Act claims, [*i.e.,* 15 U.S.C. §§ 1114(1) and 1125(a) ] Gucci must demonstrate (1) that it has a valid mark that is entitled to protection under the Act and (2) that Defendants' actions are likely to cause confusion as to the origin of the mark."); *see also Malletier,* 426 F.3d at 537; *In re Vuitton,* 606 F.2d at 4; *Gucci Am., Inc. v. Accents,* 955 F.Supp. 279, 282–83 (S.D.N.Y.1997) (converting TRO into preliminary injunction upon finding "overwhelming proof of the counterfeit nature of the seized goods, the need for continuation of the original orders and of preliminary injunctive relief against defendants to prevent irreparable harm to plaintiffs, [and] the likelihood that plaintiffs will prevail on the merits of at least the present injunctive portions of their underlying claims").

**\*5** However, the docket does not indicate that SDT was served with a summons and complaint. The Court will convert the TRO into a preliminary injunction against SDT at such time as Plaintiffs present evidence that SDT was, in fact, properly served. Plaintiffs should submit a proposed preliminary injunction along with proof of service by April 6, 2006.

### C. *Waitex*

#### 1. Preliminary Injunction

Plaintiffs argue that they "have shown a strong likelihood" that Waitex is "directly liable" and "contributorily liable" for "TC Fashions' counterfeiting activities" because Waitex "took an active role in opening boxes, cutting labels and sewing new labels on, and repacking goods for pickup" and because "Waitex had intimate knowledge of [the] suspicious nature of TC Fashions' business, as well as general expertise in the apparel industry, and cannot credibly claim that it should not have known that TC Fashions was transacting in counterfeit apparel." (Pl. Sur–Sur Reply at 1–4; *see* Pl. Reply at 7 (citing Saenz Decl. ¶ 5 ("I observed Waitex employees opening all of the boxes that come to its warehouse on behalf of TC Fashions, cutting out the labels on the apparel in those boxes, sewing on new labels and repackaging the goods in unmarked boxes for pickup.")); Elings Supp. Decl. Ex. G.)

Waitex argues, among other things, that it "was never ... notified prior to this litigation" that TC Fashions engaged in counterfeiting and "Waitex has terminated warehouse services with TC Fashions since this litigation evidencing TC Fashions counterfeiting activities." (Waitex's Sur–Reply at 7 (citing Sur–Reply Declaration of W.K. Wong, dated November 30, 2005 ("Wong Sur–Reply Decl.") ¶ 2 ("prior to this ... suit, Waitex had never received notice that TC Fashions was engaged in counterfeiting" and that "[s]hortly after the raids on the warehouses, Waitex ... terminated warehouse distribution services with TC Fashions....")) .) Waitex also asserts that "Waitex has never sewn Plaintiff [s'] labels for TC Fashions," (Waitex Sur–Reply at 2 (citing Declaration of Kevin Liu, dated November 30, 2005 ("Liu Decl.") ¶ 2 ("TC Fashions has never requested Waitex to sew Plaintiffs' labels and Waitex has never sewn Plaintiffs' labels on behalf of TC Fashions. In fact, since 2002, no sewing services were provided to TC Fashions in any capacity."); Wong Sur–Reply Decl. ¶ 5 ("Waitex has never sewn or cut any of plaintiffs' labels for TC Fashions. Waitex did 'cut' labels for TC Fashions on occasion, ... but never for plaintiffs' labels. Since 2002, Waitex has not done any sewing of any labels for TC Fashions. Since January 2005, Waitex has not cut any labels for TC Fashions.")), and that on the dates on which its warehouses were searched by Plaintiffs, "Waitex employees were cutting out and sewing in labels for [another] Waitex warehouse customer, XES–NY, and sewing in XES–NY's owned J.A.C. brand label." (Waitex Sur–Reply at 2 (citing Liu Decl. ¶¶ 5–6; Wong Sur–Reply Decl. ¶¶ 3–5).) Further, Waitex argues that it houses thousands of legitimate PRL USA garments and "there is no way for Waitex, a public warehouse, to ensure that all of these goods are authentic while continuing to provide its services to clients, without disrupting its normal and logistically precise supply chain management services, to verify the authenticity of each garment." (Waitex Sur–Reply at 10 (citing Wong Sur–Reply Decl. ¶ 9); Wong Decl. ¶ 6 ("It is impossible for Waitex to investigate or have knowledge of whether each client's products are authentic, whether the client is authorized, whether brands are private brands or licensed brands, and the like. Nor can Waitex police the voluminous in and out flow of millions of garments.").) Waitex requests that if "the Court does not deny the preliminary injunction, the Court should allow a hearing in light of the bitterly disputed facts between the parties." (Waitex's Sur–Reply at 5 (citing *Forts v. Ward,* 566 F.2d 849, 851–52 (2d Cir.1977)).)

**\*6** "On a motion for preliminary injunction, where essential facts are in dispute, there must be a hearing ... and appropriate findings of fact must be made."

*Fengler v. Numismatic Americana, Inc.,* 832 F.2d 745, 747 (2d Cir.1987) (internal quotations omitted). Waitex's involvement with TC's counterfeiting operation is disputed and requires a hearing, unless the parties are able to resolve these issues on their own. *See Fengler,* 832 F.2d at 747. [8] As with all other open issues in this case, the parties are directed to meet and confer forthwith in an effort to reach an agreement. The parties (jointly) shall inform the Court by April 6, 2006 as to whether they have been successful. If they have not, the Court may refer the matter to Judge Fox for a hearing.

### 2. Restrained Assets

Waitex argues that "Plaintiffs are not entitled to restrain any of Waitex's assets" because "Waitex is a robust and financially secure company that is not going to cut and run." (Def. Mem. at 11.) Plaintiffs respond that they have "sent a letter to HSBC instructing the bank to release the account." (Pl. Reply at 8.) As Plaintiffs have consented to release Waitex's assets, this issue is moot.

### D. *Seized Property*

Waitex asserts that Plaintiffs seized documents and computers containing "information not relating to TC Fashions, Inc., SDT USA, Inc., Great Value Inc., and/or EB Garments Inc. or the marks at issue herein" and "proprietary information regarding Waitex's data, operations, information technology, and procedures. Should this information be shared with others in the industry, we could lose our competitive advantage in the field." (Wong Decl. ¶ 17.) Waitex also asserts that "both Waitex's and its clients' information and trade secrets are at risk" because, through the seized computers, "plaintiffs have access to the pricing information of competitors, clients' brands, clients' range and type of products, as well as the customer lists of each and every Waitex client." (Wong Decl. ¶ 18.) Waitex requests that "all information, documents and computer information retained by plaintiffs ... be treated as confidential —attorneys eyes only." (Def. Mem. at 12–13.) TC Defendants allege that Plaintiffs have failed to return within five business days certain of their documents and computers that were seized, as directed under the TRO.

(Def. Mem. at 3; *see* TRO at 6 ("merchandise, records or other items seized shall be impounded in the custody or control of Plaintiffs ... pending further order of this Court [and] any such records seized ... shall be copied and the copies returned to Defendants within five (5) business days of the date this Order is executed.").) Plaintiffs do not respond to these issues.

Information from documents or computers seized from Waitex and retained by Plaintiffs shall be treated as confidential until further notice. The parties are directed to meet and confer forthwith and to submit a proposed protective order for the Court's endorsement on or before April 6, 2006. Also, to the extent Plaintiffs have failed to return computers or copies of seized documents to TC Defendants, they are directed to do so forthwith. (*See* TRO at 6.) [9]

### IV. Conclusion and Order

**\*7** Plaintiffs' application to convert the TRO into a preliminary injunction against TC Defendants is granted. The Court will grant Plaintiffs' application to convert the TRO into a preliminary injunction against SDT USA at such time as Plaintiffs submit proof of service of process upon SDT USA. The existing TRO shall remain in effect until such time as the preliminary injunction is entered by the Clerk of the Court. Plaintiffs' application for a preliminary injunction as to Waitex is deferred and the TRO shall remain in effect against Waitex pending either an agreement between the parties or an evidentiary hearing.

The parties are directed to meet and confer in good faith on all open issues forthwith and to submit for the Court's endorsement on or before April 6, 2006: (i) a proposed order of preliminary injunction; (ii) a proposed protective order; and (iii) any other settlements. The parties also are directed to submit a joint letter by April 6, 2006 informing the Court as to whether they have reached agreement on unresolved issues.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 838993

### Footnotes

2006 WL 838993

1    Plaintiffs also assert common law trademark and unfair competition claims, as well as claims under New York General Business Law §§ 360(l) and 349. (Complaint ¶¶ 53–70.) By order dated December 27, 2005, the Court unsealed the record in this case. (Memorandum Endorsement, dated December 27, 2005 ("Sealing is vacated in the interest of public disclosure (and in the absence of authorities presented by the parties).")

2    After several extensions, the Court ordered, on January 18, 2006, that "the terms of the TRO shall remain in place in full until such time as the Court rules on Plaintiffs' request for a preliminary injunction." (Order Extending Temporary Restraining Order, dated January 18, 2006.)

3    The proposed preliminary injunction may well contain "detailed provisions allowing any defendant to seek relief from the asset freeze if the defendant present[s] documentary proof that particular assets [are] not the proceeds of counterfeiting activities." *See Cartier Int'l B.V. v. Liu,* No. 02 Civ. 7936, 2003 WL 1900852, at *1 (S.D.N.Y. Apr. 17, 2003).

4    Plaintiffs initially indicated that they "are aware that the banks have restrained only about $254,000 of TC Fashions' monies and $168,000 of SDT USA's monies," (Pl. Reply at 9 (citing Elings Supp. Decl. ¶ 14)), but later explained that they have restrained "approximately $1,000,000." (Supplemental Declaration of G. Roxanne Elings, dated December 7, 2005 ("Elings 2d Supp. Decl.") ¶ 4.)

5    Plaintiffs initially argued that "TC Fashions' annual revenues from the sale of counterfeit goods total approximately eight million dollars," (Pl. Reply at 9), although the spreadsheet Plaintiffs submitted appears to show annual revenues totaling $6.8 million. (*See* Elings Supp. Decl. Ex. K.)

6    TC Defendants have not established, for example, that certain frozen assets are derived from proceeds from the sale of securities and not the sale of counterfeit garments. Although TC Defendants have submitted evidence showing that Great Value received money from the sale of securities, (*see* Yuen Sur–Reply Decl. Ex. G (broker statements)), they have not submitted any documentary evidence showing that these proceeds were transferred to a bank account that is currently frozen pursuant to the TRO.

7    The evidence in the record warrants a continuation of the existing asset freeze without prejudice to the parties' submissions to Judge Fox.

8    The Court notes that a proposed preliminary injunction enjoining Waitex from dealing with any goods bearing Plaintiffs' trademarks appears, at this stage, overly broad. *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 220 (2d Cir.2003) ("Injunctive relief should be narrowly tailored to fit specific legal violations. Accordingly, an injunction should not impose unnecessary burdens on lawful activity.") (citation and quotation omitted).

9    Waitex also complains that Plaintiffs did not properly notify Waitex that it was a defendant in this action at the time Plaintiffs searched the warehouses and that Plaintiffs exceeded the scope of the TRO by seizing Waitex's property and causing damage to property belonging to clients other than TC or SDT. (*See* Def. Mem. at 7; Wong Decl. ¶¶ 11, 14.) If the parties are unable to resolve these issues themselves, Waitex may bring these complaints as counterclaims. *See* 15 U.S.C. § 1116(d)(11) ("A person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made...."); *Reebok Int'l Ltd. v. Su Youn Pak,* No. 87 Civ. 2727, 1989 WL 76225, at * (S.D.N.Y. June 30, 1989); *see also Accents,* 955 F.Supp. at 282 ("such responses to Fourth Amendment violations as suppression of unlawfully-seized evidence may well be available to victims of unlawfully-obtained seizure orders under the Trademark Counterfeiting Act, even if the goods prove in fact to be counterfeit.").

---

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4901407

2012 WL 4901407
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

KLIPSCH GROUP, INC., Plaintiff,
v.
BIG BOX STORE LTD. d/b/a BigBoxStore.com
and BigBoxSave.com, et al ., Defendants.

No. 12 Civ. 6283(AJN).
|
Oct. 11, 2012.

MEMORANDUM AND ORDER

ALISON J. NATHAN, District Judge.

**\*1** For the reasons that follow, the Court GRANTS
Defendant DealExtreme.com's ("DealExtreme") requests
to reduce the amount of its assets that are frozen and
to halt expedited discovery, and DENIES DealExtreme's
request for reconsideration of the Court's finding that
Plaintiff, Klipsch Group, Inc. ("Klipsch"), has established
a likelihood of success on the merits.

## I. PROCEDURAL BACKGROUND

On August 16, 2012, the Court imposed a Temporary
Restraining Order against 20 defendants in this action,
including DealExtreme, barring them from selling
counterfeit versions of Plaintiff's products. (Docket # 48).
As part of that Order, the Court, in accordance with
15 U.S.C. § 1116(a) and its inherent equitable power,
restrained payment processors, including PayPal, from
allowing DealExtreme to transfer or withdraw funds in its
accounts. (Id.).

Pursuant to that Order, Plaintiff obtained a freeze on $2
million in money belonging to DealExtreme. (Chow 9/7/12
Decl. ¶ 25). Plaintiff represented to the Court that there
was actually more money flowing through DealExtreme's
accounts, but that Plaintiff agreed to hold aside only $2
million. (9/14/12 Tr. at 16:23–17:19).

Following a hearing held on September 14, 2012,
the Court converted the Temporary Restraining Order
against DealExtreme into a Preliminary Injunction.

(Docket # 48). In light of documentary evidence presented
by DealExtreme indicating that it generated gross
revenues of only $6,346.40 from global sales of Klipsch-
branded goods, and that it generated only $691.70 of that
from sales into the United States, the Court expressed
wariness about maintaining a freeze on $2 million of
DealExtreme's assets. (9/14/12 Tr. at 49:16–51:1, 55:13–
22).

As a result, the Court, consistent with the approach
taken by Judge Berman in North Face Apparel Corp. v.
TC Fashions, Inc., 2006 WL 838993, at \*3 (S.D.N.Y.
Mar. 30, 2006), granted DealExtreme one week to present
additional evidence to establish that the assets seized are
not the proceeds of counterfeiting activity.

On September 21, 2012, DealExtreme submitted a
supplemental Declaration from Daniel Chow, the CEO of
ePRO, DealExtreme's parent company, (Docket # 54), as
well as a supplemental opposition brief. (Docket # 55).
Plaintiff submitted a response on September 26, 2012,
(Docket # 's 57–60), and the parties exchanged letters
through September 28, 2012. (Docket # 's 63–65).

As discussed below, because Courts in this district
have confined asset freezes to sums related to potential
equitable remedies and to those assets related to
counterfeiting activity, and because the Court, for
purposes of this decision, is satisfied with DealExtreme's
showing that it earned less than $1,000 in profits from the
sale of Klipsch-branded goods, the Court finds that the
present $2 million asset freeze is well in excess of what is
appropriate.

## II. DISCUSSION

### A. Assets May be Restrained To Preserve Equitable Remedies

**\*2** Courts in this district have exercised their equitable
powers in Lanham Act cases to restrain assets to
preserve the return of profits derived from the sale of
counterfeit goods and to insure counterfeiting Plaintiffs
the accounting to which they are entitled. See, e.g., Gucci
Am. v. Weixing Li, 2011 WL 6156936, at \*4 (S.D .N.Y.
Aug. 23, 2011) ("an asset freeze is appropriate in order
to determine the amount by which Defendants profited
from their counterfeiting activities."); Belenciaga Am. v.
Dollinger, 2010 WL 3952850, at \*7 (S.D.N.Y. Oct. 8,
2010) ("[t]he court ... has authority to freeze the Individual

Defendants' assets insofar as they could be used to satisfy an award of their profits pursuant to Plaintiffs' Lanham Act claims"); *North Face Apparel,* 2006 WL 838993, at *3 ("District courts have the authority to freeze those assets which could be used to satisfy an equitable award of profits.").

Plaintiff has asked the Court to exercise its equitable powers to restrain assets not only sufficient to satisfy an award of counterfeiting profits, but also to ensure that sufficient funds are available to satisfy a judgment for statutory damages. (9/26 Supp. Br. at 8–10). Plaintiff asserts that "no case has ever specifically excluded damages as a basis for the asset restraint." § *Id.* at 8). But courts in this district have focused on freezing assets to preserve the equitable remedies of a return of lost profits and an accounting, not statutory damages. *See, e.g., Gucci Am.,* 2011 WL 6156936, at *4; *Belenciaga Am.,* 2010 WL 3952850 at *7; *North Face Apparel,* 2006 WL 838993, at *3. And freezing assets exclusively for the purpose of preserving funds that may later be awarded as money damages would appear contrary to the Supreme Court's holding in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 333 (1999) (district court "had no authority to issue a preliminary injunction preventing [a party] from disposing of [its] assets pending adjudication of [a] contract claim for money damages."); *see also Gucci Am.,* 2011 WL 6156936, at *4. [1] This Court therefore will confine the asset freeze to that money which may be used to satisfy an equitable remedy.

### B. *DealExtreme has Met its Burden of Showing that the Vast Majority of Assets Restrained are Unrelated to the Sale of Counterfeit Klipsch Goods*

In addition to confining the asset freeze to money that could be used to satisfy an award of profits, "the Court may exempt any particular assets from the freeze on the ground that they [are] not linked to the profits of allegedly illegal activity." *North Face Apparel,* 2006 WL 838993, at *3 (alteration in original) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995)). "The burden is on the party seeking relief to 'present documentary proof that particular assets [are] not the proceeds of counterfeiting activities.' " *Id.* (alteration in original) (quoting *Cartier Int'l B.V. v. Liu,* 2003 WL 1900852, at *1 (S.D.N.Y. Apr. 17, 2003)).

**\*3** DealExtreme has presented to the Court documentary evidence indicating that it only earned $5,744.40 in gross sale of Klipsch-branded products globally. (Docket # 54 ¶ 13). [2] DealExtreme's records indicate that it has generated only $124.40 in profits from all of its sales into the United States and $866.98 in profits from its worldwide sales of Klipsch-branded goods. (Docket # 54 ¶¶ 15–16).

The CEO of DealExtreme's parent, ePRO, a publicly-traded Hong Kong company, has submitted two sworn declarations testifying to the veracity of financial records reflecting these sales. (Docket # 's 32, 54). The records produced by DealExtreme include the zip codes of all of its customers in the United States who purchased Klipsch-branded products, the amount billed, the shipping dates, and any refunds for returned products. (Docket # 54–1). DealExtreme also provided a list of each one of its worldwide sales of Klipsch-branded goods. (Docket # 54–1). DealExtreme further provided information regarding the amounts that it paid its suppliers for Klipsch-branded goods and the names of the suppliers. (Docket # 54). The Court finds this showing to be persuasive.

Plaintiff seeks to undermine the credibility of DealExtreme's showing by calling the Court's attention to certain aspects of the documents. (Docket # 57 at 6). For example, Plaintiff argues that the computer-generated records of Klipsh-branded sales is unsatisfactory because it was put together for the purpose of this litigation. (*Id.*). But Defendant has provided a plausible explanation as to how it conducted a search, and that paper records are not ordinarily maintained in the course of its computer-centered business. (Docket # 65 at 2). The credibility of Mr. Chow's sworn statement and the exhibits attached thereto are not undermined by the fact that the financial records were generated specifically for purposes of this litigation. This is especially true since many of these documents were generated following the Court's request for such documentation at the September 14, 2012 hearing.

Thus far, Plaintiff has only documented a single sale of a counterfeit Klipsch-branded product sold through DealExtreme's website, a transaction that occurred over six months before this lawsuit was commenced. (Docket # 20 Ex. F). DealExtreme's records indicate that it has generated less than $1,000 in net profits from $5,744.40 in global sales of Klipsch-branded goods. (Docket # 54). The Court recognizes that there may be some

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 59 of 75 PageID #:2796
Klipsch Group, Inc. v. Big Box Store Ltd., Not Reported in F.Supp.2d (2012)

2012 WL 4901407

dispute as to DealExtreme's profit margin on the sale of Klipsch-branded goods and the volume of such sales. Yet given that Plaintiff, to obtain its *ex parte* Temporary Restraining Order, produced evidence that only a single counterfeit Klipsch-branded product was sold through DealExtreme's website, and that DealExtreme subsequently voluntarily disclosed that $5,744.40 worth of such counterfeit products were sold through its website, the Court does not see any indication that a freeze greater than $20,000 is necessary to preserve Plaintiffs right to an accounting and to the return of profits from the sale of counterfeit goods through Defendant's website. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 71–72 (2d Cir.1998) ("A district court faced with a Lanham Act violation possesses some degree of discretion in shaping [the] relief according to the principles of equity and the individual circumstances of each case" within the parameters of allowing an accounting for profits) (internal quotation marks omitted).

### C. *Expedited Discovery*

**\*4** DealExtreme also objects to the order of expedited discovery contained in the Preliminary Injunction. (*See* Docket # 48). Recent cases in this district have applied a flexible "good cause" standard in determining whether expedited discovery is appropriate. *Digital Sin, Inc. v. Does 1–176,* 279 F.R.D. 239, 241 (S.D.N.Y.2012). Plaintiff argues that it is entitled to expedited discovery because it has demonstrated a likelihood of success on the merits, irreparable harm, and some connection between expedited discovery and continued infringement. However, DealExtreme is enjoined from selling counterfeit Klipsch-branded goods (Docket # 48) and has voluntarily produced the names of its suppliers of previously-sold counterfeit goods. (Docket # 54). There therefore exists little evidence that any additional injury to Plaintiff will result from DealExtreme's conduct absent expedited discovery.

DealExtreme has already provided Plaintiff with the information necessary to limit further irreparable harm.

An initial pretrial conference has been scheduled for December 7, 2012. The Court intends to place this case on a fair and efficient schedule. Indeed, the vast majority of cases before this Court are expected to complete fact discovery within 120 days, and no reason has yet been shown to the Court why this case will require a fact discovery period in excess of that length. Under these circumstances, Plaintiff has not demonstrated a need for additional expedited discovery.

### D. *The Court is Not Persuaded to Alter its Conclusion that Plaintiff has Demonstrated a Likelihood of Success*

DealExtreme, not contesting that counterfeit Klipsch goods were sold through its website, argues that it has presented additional evidence regarding its operations that cast doubts on Plaintiff's ability to succeed on the merits in this action. (Docket # 65). DealExtreme may present this evidence at trial. In the interim, the Court has not been provided with a sufficient basis to reconsider its preliminary determination.

### CONCLUSION

The amount of the assets presently frozen shall be reduced to $20,000. DealExtreme's request that the Court reconsider its ruling on likelihood of success is DENIED. DealExtreme's request to stop any expedited discovery is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4901407

---

Footnotes

1   Plaintiff relies on the Ninth Circuit's decision in *Reebok v. Marnatech,* 970 F.2d 552, 559 (9th Cir.1992), which predates the Supreme Court's decision in *Grupo Mexicano.*

2   DealExtreme initially reported to the Court that it generated $6,346.40 in gross profits on its worldwide sale of Klipsch-branded goods (Docket # 32), but later revised down that number to $5,744.40 after taking into account returned goods. For the same reason, DealExtreme revised down its total gross revenue from the sale of Klipsch-branded goods into the United States from $691.70 to $661.80. (Docket # 54 ¶ 5).

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**Klipsch Group, Inc. v. Big Box Store Ltd., Not Reported in F.Supp.2d (2012)**

2012 WL 4901407

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:18-cv-07440 Document #: 46-1 Filed: 05/14/19 Page 61 of 75 PageID #:2798
Tiffany (NJ) LLC v. Qi Andrew, Not Reported in F.Supp.3d (2015)

2015 WL 3701602

2015 WL 3701602
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

TIFFANY (NJ) LLC, et al., Plaintiffs,
v.
QI ANDREW, et al., Defendants.

No. 10 Civ. 9471(KPF)(HBP).
|
Signed June 15, 2015.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge.

 **\*1** Plaintiffs Tiffany (NJ) LLC and Tiffany and Company (collectively, "Tiffany") have presented the Court with a Proposed Default Judgment against all Defendants in this action. Tiffany alleges that Defendants committed trademark violations by selling knock-off Tiffany products over the internet. Tiffany seeks, *inter alia,* an accounting of Defendants' profits, with $52 million awarded as a proxy for these profits, and a postjudgment freeze of Defendants' assets worldwide, including assets held in various Chinese bank accounts. Defendants, having not appeared in this action since its inception more than four years ago, offer no opposition. In marked contrast, the Court has heard at length from several non-party banks—Bank of China ("BOC"), Industrial and Commercial Bank of China, Ltd. ("ICBC"), and China Merchants Bank ("CMB") (collectively, the "Non–Party Banks"). Each of the Non–Party Banks holds assets belonging to Defendants, and each argues that the Court lacks the authority to issue the postjudgment asset freeze that Tiffany proposes.

For the reasons set forth herein, although Tiffany's application for a default judgment will be granted, the Court will modify the Proposed Default Judgment in two significant ways: first, the Court will award statutory damages instead of an accounting of profits; and second, the Court will strike the requested postjudgment asset freeze.

## BACKGROUND

### A. Factual Background

The Court assumes familiarity with facts of this case, as set forth in the Opinions written by Magistrate Judge Henry B. Pitman. *See Tiffany (NJ) LLC v. Qi Andrew,* No. 10 Civ. 9471(RA)(HBP), 2012 WL 5451259 (S.D.N.Y. Nov. 7, 2012); *Tiffany (NJ) LLC v. Qi Andrew,* 276 F.R.D. 143 (S.D.N.Y.2011). In brief, this is a trademark counterfeiting case in which Tiffany alleges that Defendants sold counterfeit Tiffany products through U.S.-based websites such asTiffanyStores.org. (Dkt. # 76 ("Am.Compl.") ¶¶ 1–17). Tiffany claims that Defendants used PayPal, Inc. ("PayPal") to process customers' credit card transactions, and then transferred the proceeds of the sales to accounts held by the Non–Party Banks. (Am.Compl.¶¶ 53–70).

### B. Procedural Background

Tiffany filed this action on December 21, 2010. (Dkt.# 1). On January 3, 2011, District Judge William H. Pauley III, after holding a preliminary injunction hearing at which Defendants failed to appear, entered a preliminary injunction that enjoined the Defendants' counterfeiting operation, froze their assets, and provided for expedited discovery from Defendants and third-parties. (*See* Dkt. # 4, 6, 7).

Tiffany thereafter obtained documents from non-party PayPal; the documents showed that Defendants had wired in excess of $250,000 from their PayPal accounts into specific accounts held by the Non–Party Banks. (Dkt. # 73 at 4). Tiffany received additional information regarding Defendants from the Non–Party Banks through the Hague Convention. (*See* Dkt. # 59 at 8–10). [1] On June 14, 2013, this case was reassigned to this Court. (Dkt.# 71).

 **\*2** On August 22, 2013, with leave of the Court, Tiffany amended the Complaint to add new Defendants. (Dkt.# 76). On November 18, 2013, the Court issued an Order to Show Cause as to why a Default Judgment should not be entered. (Dkt.# 79). None of the Defendants responded; however, prior to the Order to Show Cause Hearing, the Non–Party Banks submitted letters to the Court, requesting an opportunity to submit briefing on the issues raised by Plaintiffs' Proposed Default Judgment,

and highlighting for the Court two appeals pending before the Second Circuit in similar trademark actions. (Dkt. # 83, 84 (citing *Gucci Am., Inc. v. Li,* No 11–3934–cv, and *Tiffany (NJ) LLC v. Forbse,* No. 12–2317–cv)). [2] In *Gucci* and *Forbse,* the Non–Party Banks appealed orders following the district courts' issuance of prejudgment asset freeze injunctions similar in scope to the one issued in the instant action, and similar to the postjudgment asset freeze contained in the Proposed Default Judgment. The Court adjourned the Order to Show Cause Hearing *sine die,* and directed Plaintiff and the Non–Party Banks to submit letter briefs following the issuance of the Second Circuit's decisions in *Gucci* and *Forbse.* (Dkt.# 86).

**C. The Second Circuit's Decisions in *Gucci* and *Forbse***
On September 17, 2014, the Second Circuit issued an Opinion in *Gucci Am., Inc. v. Weixing Li,* 768 F.3d 122 (2d Cir.2014). Because "[t]he legal issues decided in *Gucci* substantially overlap[ped] with the legal issues presented [in *Forbse* ]," the Second Circuit "incorporate[d] the legal analysis in *Gucci*" into a Summary Order in the *Forbse* action, captioned on appeal as *Tiffany (NJ) LLC v. China Merchants Bank,* 589 F. App'x 550 (2d Cir.2014) (summary order). [3]

In *Gucci,* after District Judge Richard J. Sullivan issued a preliminary injunction freezing the defendants' assets, plaintiffs filed a motion to compel the compliance of non-party BOC with the asset freeze and with various requests for documents. The court granted the motion, and, when BOC failed to comply, the court held the Bank in civil contempt and imposed civil monetary penalties.

The Second Circuit affirmed the district court's issuance of the prejudgment asset freeze injunction because "[t]he [district] court had personal jurisdiction over the defendants, as well as the equitable authority to issue the prejudgment freeze." 768 F.3d at 129. The Court first addressed the issue of whether personal jurisdiction of the non-party bank was a prerequisite to the injunction. It rejected the argument, advanced by the non-party bank,

> that personal jurisdiction over the Bank was required for the district court to issue the ... Asset Freeze Injunction restraining the *defendants*' assets. BOC does not

argue that the *defendants* are not subject to personal jurisdiction in New York State. And personal jurisdiction over the *defendants,* not the Bank, is all that was needed for the district court to restrain the defendants' assets pending trial.

**\*3** *Gucci,* 768 F.3d at 129 (emphasis in original) (citing *United States v. First Nat'l City Bank,* 379 U.S. 378, 384 (1965)).

Relying on its decision in *NML Capital, Ltd. v. Republic of Argentina,* 727 F.3d 230 (2d Cir.2013), *cert. denied,* 134 S.Ct. 2819 (2014), the Second Circuit made clear that because the asset freeze injunction did not directly enjoin BOC, it was "irrelevant" whether the district court had personal jurisdiction over the non-party bank when issuing the injunction. *Gucci,* 768 F.3d at 129 (citing *NML Capital,* 727 F.3d at 243). The Court acknowledged, echoing *NML Capital,* that Federal Rule of Civil Procedure 65(d) automatically forbids others—who are not directly enjoined but who act "in active concert or participation" with an enjoined party—from assisting in a violation of the injunction. It reiterated that such injunctions "do not directly restrain the conduct of nonparties. Instead, they provide these nonparties with notice that 'they could become liable through Rule 65 if they assist ... in violating the district court's orders.' " *Id.* at 130 (quoting *NML Capital,* 727 F.3d at 243). Although questions of personal jurisdiction over non-parties must be addressed before the determination of a non-party's liability or the issuance of sanctions against a non-party, the Second Circuit made clear that "the district court need not have personal jurisdiction over nonparties to issue a preliminary injunction requiring a party before it to refrain from moving assets during the pendency of the proceedings." *Id.*

The Court next addressed the issue of whether the district court had the equitable authority under *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999), to issue a prejudgment asset freeze. In *Grupo Mexicano,* the Supreme Court held that the district court "had no authority [under Rule 65] to issue a preliminary injunction preventing [defendants] from disposing of their assets pending adjudication of [plaintiffs'] contract claim for *money damages.*" 527 U.S. at 333 (emphasis added).

Parsing *Grupo Mexicano,* the Second Circuit explained that, while "district courts have no authority to issue a prejudgment asset freeze pursuant to Rule 65 where such relief was not traditionally accorded by courts of equity[,] ... they maintain the equitable power to do so where such relief *was* traditionally available: where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ancillary to the final relief." *Gucci,* 768 F.3d at 131 (emphasis in original, internal quotation marks and citations omitted). Applying this principle to the plaintiffs' complaint alleging trademark infringement, the Second Circuit held that the injunction withstood scrutiny:

> Plaintiffs are seeking an *accounting* of the defendants' profits, in addition to injunctive relief and monetary damages, under the Lanham Act.... [T]he common law action of "account" is one of the earliest examples of a restitutionary action in equity, imposing on a defendant the obligation to disclose and return profits from the use of the plaintiff's property, and founded in the Chancellor's equitable power to compel an accounting of wrongly gained assets.

**\*4** *Id.* (emphasis in original, internal citations omitted).

The Second Circuit also addressed BOC's argument that the plaintiffs' accounting claim was "illusory"—specifically, that they were simply including the prayer for an accounting of profits in order to obtain an asset freeze, in the hope of eventually securing a statutory damages award. *Gucci,* 768 F.3d at 133. The Court dismissed this argument, noting that

> Under the Lanham Act ... plaintiffs "may elect" between statutory or actual damages "at any time before final judgment is rendered." 15 U.S.C. § 1117(c). Each of plaintiffs' three complaints has sought an accounting of profits (or actual damages) and there is no basis, on this record, to conclude that plaintiffs are not seeking what they ask for.

*Id.*

Although the Second Circuit upheld the issuance of the prejudgment asset freeze, in light of the Supreme Court's intervening decision in *Daimler AG v. Bauman,* 134 S.Ct. 746 (2014), it ruled that the district court had erred in its finding that the non-party bank, BOC, was properly subject to the court's general jurisdiction. *Gucci,* 768 F.3d at 133. The Second Circuit remanded the case so that the district court could consider: (i) whether it could exercise specific jurisdiction over BOC to order compliance with the asset freeze and subpoenas; and (ii) whether, assuming the necessary jurisdiction were present, such an order would be consistent with principles of international comity. *Id.* at 145. The Second Circuit vacated those portions of the district court's orders that compelled BOC's compliance with the asset freeze and subpoenas, and reversed the district court's finding of contempt. *Id.* at 144.

For similar reasons, in *Forbse,* the Second Circuit "vacate[d] the [district court's] order requiring [BOC, ICBC and CMB] to comply with the asset freeze injunction and remand[ed] for the district court to determine, in accordance with ... *Gucci,* whether it may properly exercise jurisdiction over the [non-party] Banks for the purpose of compelling their compliance with the asset freeze." 589 F. App'x at 553.

### D. The April 29, 2015 Hearing

On April 29, 2015, the Court held a hearing to discuss the Proposed Default Judgment. The hearing served the dual purposes of affording Defendants one final chance to contest the default judgment, and permitting the Court to explore the parameters of the postjudgment asset freeze. Although Defendants were served with a notice of the hearing, they failed to appear. (*See* Dkt. # 101). At the Court's request, counsel for the Non–Party Banks attended the hearing to address the postjudgment asset freeze, which had been the subject of a series of letter briefs following the issuance of *Gucci* and *Forbse.* (*See* Dkt. # 87–92, 94–98). After discussing with Tiffany the allegations in the Amended Complaint and Defendants' failure to appear in this action, the Court indicated at the hearing that a finding of Defendants' liability was appropriate, and would be entered. (*See* Dkt. # 102 (Transcript of the April 29, 2015 Default Judgment Hearing ("Hrg.Tr.")) 35). However, with respect to the

postjudgment asset freeze, the Court reserved its decision to allow for further consideration of the issues presented during the hearing. (*Id.* at 3536).

## DISCUSSION

### A. Standard on a Default Judgment

**\*5** "The decision whether to enter default judgment is committed to the district court's discretion, as is the decision whether to conduct a hearing before deciding the default judgment motion." *Greathouse v. JHS Sec. Inc., 784 F.3d 105, 116 (2d Cir.2015)* (internal citations omitted); *see generally* Fed.R.Civ.P. 55(b)(2) ("The court may conduct hearings or make referrals ... when, to enter or effectuate judgment, it needs to ... conduct an accounting; ... determine the amount of damages; ... establish the truth of any allegation by evidence; or ... investigate any other matter."); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2684, at 28 ("The court has discretion to decide whether to enter a judgment by default, ... and Rule 55(b)(2) empowers the district judge to hold hearings or 'order such references as it deems necessary and proper' to aid its execution of this discretion.").

In the context of a default judgment proceeding, a court approaches the issues of a defendant's liability and the appropriate relief separately. After a court has determined that a defendant is in default, it must "accept[ ] as true all of the factual allegations of the complaint" for the purposes of determining liability. *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir.1981); *accord Finkel v. Romanowicz,* 577 F.3d 79, 83–84 & n. 6 (2d Cir.2009). However, "[t]he entry of a default, while establishing liability, 'is not an admission of money damages.' " *City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 128 (2d Cir.2011) (quoting *Finkel,* 577 F.3d at 83 n. 6). The prayer for relief in the complaint represents the outer boundary (the ceiling, in the case of money damages) of what may be awarded. *See* Fed.R.Civ.P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."); *Silge v. Merz,* 510 F.3d 157, 160 (2d Cir.2007). But a court otherwise retains the ability to "award[ ] the plaintiff any relief to which the court decides it is entitled." *Mickalis,* 645 F.3d at 128.

### B. Analysis

### 1. The Non–Party Banks' Standing

A threshold issue presents itself, namely, whether the Court should even consider the arguments raised by the Non–Party Banks in opposing the postjudgment asset freeze injunction contained in the Proposed Default Judgment. Tiffany's argument is simple: "the banks have no standing to oppose the proposed default judgment in this case" because they have not moved to intervene in this action. (Dkt. # 97; *see also* Hrg. Tr. 11 ("I don't think [the Non–Party Banks] have any standing to be here and complain.")). [4] The Non–Party Banks counter that they do not oppose the entry of a default judgment against Defendants, but that they have a "plausible affected interest" in the proposed asset freeze, which interest they argue suffices to confer standing under Second Circuit precedent. (Hrg. Tr. 16 ("The Second Circuit rejected th[e] argument [that the Non–Party Banks lacked standing in *Gucci* and *Forbse* ] on the basis that ... the banks had demonstrated a plausible affected interest, and that's effectively that through these injunctions [the Non–Party Banks] are in effect being told to freeze accounts in China under threat of being held in contempt if we don't."); *see id.* at 21 ("[A]ssets don't restrain themselves, so [the injunction] does require the banks to do something.... [Tiffany has] very artfully drafted [the Proposed Default Judgment] in the passive voice so it says assets will be restrained. They don't say by whom or how, and it's our position that that is the plausible affected interest[.]")).

**\*6** The Court notes, as a preliminary matter, one of the procedural oddities of this case: Although the Non–Party Banks have not intervened in this action pursuant to Fed.R.Civ.P. 24, they would likely have standing to appeal as non-parties from a judgment in this action. As the Non–Party Banks noted, a non-party who can demonstrate a "plausible affected interest" in the judgment can appeal. *See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.,* 467 F.3d 73, 78 (2d Cir.2006) ("We have not required that a nonparty prove that it has an interest affected by the judgment; stating a plausible affected interest has been sufficient."). [5] The Non–Party Banks' argument is facially compelling: If they can inevitably raise arguments challenging the asset freeze to the Court of Appeals, it makes little sense for this Court to ignore them. (Hrg. Tr. 18 ("We think the better course is not to enter an injunction for which there is no basis in the first place than to litigate these issues after the event based on an injunction that should never have

been entered.")). However, given the formal mechanism for intervention provided by Rule 24, the Court declines to consider whether prospective appellate standing somehow trickles down to the district court level. Put another way, demonstrating a "plausible affected interest" may convey appellate standing, but the Court will not say that it provides an exception to Rule 24. The Non–Party Banks are free to make their own strategic decisions as to how best to protect their interests, and they have elected not to intervene in this action.

While Tiffany is correct that the Non–Party Banks do not have standing to oppose the entry of a default judgment, that is a different question than whether the Court should consider their arguments. The Court has broad authority to "conduct hearings ... when, to enter or effectuate [a default] judgment, it needs to ... conduct an accounting; ... determine the amount of damages; ... establish the truth of any allegation by evidence; or ... *investigate any other matter.*" Fed.R.Civ.P. 55(b)(2) (emphasis added). Pursuant to this authority, the Court has invited submissions and participation at the hearing from the Non–Party Banks as the holders of Defendants' assets that are to be frozen. Such procedure may be unusual in the context of default judgment proceedings, but it is prudent given the procedural history of this case and the issues the Non–Party Banks have raised previously in this and other actions as third-party litigants. [6] Rule 55(b) affords flexibility in this procedurally one-sided context, and the Court took the opportunity to solicit information from those who could assist the Court in understanding the impact of the proposed asset freeze. Additionally, even in the absence of the Non–Party Banks' submissions in this case, the Court would not have taken as granted the propriety of a plaintiff's request for relief. Rule 55(b) neither requires nor anticipates that a plaintiff's prayer for relief be accorded any particular deference. Especially in light of Tiffany's unusual request for a postjudgment asset freeze under Rule 65, the Court is inclined to scrutinize the proposal to ensure it complies with the sources of authority invoked therein.

### 2. The Proposed Default Judgment Will Not Be Entered As Drafted

#### a. The Text of the Proposed Default Judgment

**\*7** The proposed default judgment initially submitted to the Court by Tiffany in November 2013, prior to

the Second Circuit's decisions in *Gucci* and *Forbse,* provided, *inter alia,* for an award of statutory damages for Defendants' willful trademark counterfeiting, pursuant to 15 U.S.C. § 1117(c)(2), in the amount of $1,000,000 per counterfeit mark used, for a total of $52,000,000, and statutory damages for Defendants' willful cybersquatting in the amount of $300,000. Although Tiffany's Amended Complaint included as a prayer for relief a request that the Court "[d]irect Defendants to account to Tiffany for their profits ... arising out of the acts of deception and infringement," (Am. Compl. 38 ¶ 2), Tiffany's initial proposed default judgment did not seek an accounting as a final form of equitable relief. Instead, Tiffany "elected to receive statutory damages under 15 U.S.C. § 1117(c)(2) for Defendants' willful trademark counterfeiting." (Halter Decl. ¶ 19).

After the Second Circuit issued its decisions, which emphasized the significance of the plaintiffs' request for an equitable remedy of accounting, Tiffany submitted a "revised default judgment which makes clear, in accord with the Second Circuit's ruling, that this Court [would be] awarding *the final equitable relief of an accounting of profits* that Plaintiffs sought in their complaint." (Dkt. # 90 at 1 (emphasis added)). To that end, the operative Proposed Default Judgment provides that "Plaintiffs' request for an accounting is granted. Defendants are required to account for their profits and disgorge them to Plaintiffs." (Dkt. # 90–1 ¶ 8).

The Proposed Default Judgment does not end there, however, but continues on to provide damages in lieu of profits:

> In light of the Defendants' failure to produce any documents in this action, the Court awards statutory damages pursuant to 15 U.S.C. § 1117(c) *as a proxy for Defendants' profits.* Pursuant to 15 U.S.C. § 1117(c)(2), as a proxy for Defendants' profits, Plaintiffs are entitled to an award of statutory damages in the amount of fifty-two million dollars ($52,000,000) for Defendants' willful trademark counterfeiting[.]

(Dkt. # 90–1 ¶ 8 (emphasis added)).

Similar in scope to the prejudgment asset freeze provision contained in the Preliminary Injunction, the Default Judgment contains a postjudgment asset freeze provision that restrains Defendants' assets—including those held by the Non–Party Banks—until the judgment is satisfied:

> In accordance with Rule 65 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116(a), Article 52 of New York State's Civil Practice Law and Rules, and this Court's inherent equitable power to issue remedies ancillary to its authority to provide final relief, all Defendants' Assets that have been previously identified as frozen or that were otherwise required to be restrained in compliance with this Court's orders, shall continue to be restrained, regardless of whether the Defendants' Assets are located in the United States or abroad.... This includes, but is not limited to [Defendants' accounts with the Non–Party Banks].

**\*8** (Dkt. # 90–1 ¶ 11; *see also id.* at ¶ 12 (freezing, on the same terms, "any other of Defendants' Assets that Plaintiffs identify in the future")).

Finally, the Proposed Default Judgment closes the case without prejudice to Tiffany's ability to, *inter alia,* "file a motion to find any of the holders [of] Defendants' Assets in contempt of this Court's prior orders or this Default Judgment; or ... make an application to reopen this matter in the event it is necessary to pursue sanctions for any violations of this Default Judgment." (Dkt. # 90–1 ¶ 14).

### a. Plaintiffs Have Failed to Elect Between an Accounting of Defendants' Profits and Statutory Damages

Under the Lanham Act, a successful plaintiff is "entitled, ... subject to the principles of equity, to recover

[i] defendant's profits, [ii] any damages sustained by the plaintiff, and [iii] the costs of the action." 15 U.S.C. § 1117(a). However, "the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under [Section 1117(a) ], an award of statutory damages[ .]" *Id.* § 1117(c).

On its face, the Proposed Default Judgment appears to ask for both an accounting of profits *and* statutory damages. Tiffany, however, urges the Court to construe its election as one for an accounting only, with statutory damage amounts awarded as a proxy for Defendants' profits. (Hrg. Tr. 9–10 ("[W]hat we've asked the Court to do, as a proxy for the accounting, since we all sort of know that they're not going to give us the records that we actually need to figure out how much they actually sold and how much they actually owe us is, for your Honor as a proxy to use the statutory damages[.]"); *id.* at 33 ("We were artful, coy and careful in what we asked the Court in the judgment, and we specifically asked for an accounting. And then the Court is faced with the situation of how do we do the accounting without the cooperation of the counterfeiters. And we suggested as a means of resolving this dilemma, because I think the counterfeiters should not be allowed to put themselves in a better position, in other words, to deny us an accounting because they won't cooperate."). The Non–Party Banks contend that the Lanham Act does not permit a plaintiff to hedge in this manner between recovery of profits under Section 1117(a) and statutory damages under Section 1117(c). (*Id.* at 15 ("[Tiffany] put this wording into the judgment that says an accounting is ordered and the remedy is statutory damages. The two things are mutually exclusive under the Lanham Act.... [T]he statute says it's one or the other.")). The Court agrees with the Non–Party Banks, and finds that Tiffany's failure to elect between statutory damages and profits renders the Proposed Default Judgment defective.

The Court declines the invitation from Tiffany to consider the statutory damage figures provided by Section 1117(c) as a proxy to calculate profits under Section 1117(a). When profits are difficult to calculate, or for any other reason, a plaintiff may elect to receive statutory damages. As the text of Section 1117(c) indicates, statutory damages provide relief exclusive of recovery for profits and actual damages available under Section 1117(a). *See* 15 U.S.C. § 1117(c) (statutory damages can be elected *"instead of* actual damages and profits" (emphasis added)); *see*

2015 WL 3701602

*also Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 110–11 (2d Cir.2012)* ("In 1996, Congress ... amended section 1117 to add subsection (c), providing for the alternative of statutory damages.... [T]he Act ... allows trademark plaintiffs to elect to recover statutory damages in counterfeit cases in lieu of actual damages [.]"); *Union of Orthodox Jewish Congregations of Am. v. Am. Food & Beverage Inc., 704 F.Supp.2d 288, 290–91 (S.D.N.Y.2010)* ("Subsection 1117(c) provides trademark holders an alternative remedy to actual damages[.]"); *cf. Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1380 (2d Cir.1993)* (noting that, under the analogous provision of the Copyright Act, a plaintiff may elect statutory damages or actual damages "at any time before final judgment is rendered," but is not "permit[ted] ... to pursue both remedies to a conclusion and then select the one that ultimately prove[s] more favorable"); *Oboler v. Goldin, 714 F.2d 211, 213 (2d Cir.1983)* (determining that the "[e]lection of statutory damages precludes recovery of actual damages and profits" under the analogous provision of the Copyright Act).

**\*9** In light of the *Gucci* decision, which emphasized the link between the issuance of an asset freeze injunction and the prayer for final equitable relief, Tiffany has an obvious reason for conflating the remedies. *See Gucci, 768 F.3d at 130* ("Plaintiffs here seek the equitable remedy of an accounting of profits. In such circumstances, the district court had the inherent equitable authority to issue the Asset Freeze Injunction."). But Section 1117 does not permit this Court to enter the kind of hybrid award contemplated by the Proposed Default Judgment. Instead, at some point before final judgment, Section 1117 obligates Tiffany to make a choice: Tiffany must choose whether to make the statutory damages election authorized by Section 1117(c). Because Tiffany has failed to do so, and judgment in this case is at hand, the Court must consider whether the final equitable award of an accounting of profits or statutory damages is appropriate.

**b. Statutory Damages Are the Appropriate Remedy**

Tiffany argues that, in light of Defendants' default and failure to produce records regarding their profits, the Court faces a dilemma as to the appropriate remedy. Specifically, Tiffany asserts that it otherwise would elect an accounting of Defendants' profits, but is hindered in doing so because of Defendants' refusal to appear. Tiffany argues that it "should not be denied [the] remedy of an accounting because [the counterfeiters]

won't cooperate." (Hrg. Tr. 24). Because the Lanham Act provides for statutory damages precisely to address situations such as this, the Court disagrees that is faces any such dilemma: Statutory damages are the appropriate remedy.

The Court has already rejected what Tiffany has "suggested as a means of resolving [the] dilemma" caused by Defendants' failure to produce records of their profits (Hrg. Tr. 24)—namely, awarding a nominal accounting while concurrently substituting statutory damages figures into the judgment as a proxy for profits—because the Lanham Act does not permit this sort of remedy. More fundamentally, the Court disagrees with Tiffany that *the Court* should craft a remedy to address Tiffany's particular situation because Congress has already supplied the appropriate remedy for circumstances such as this.

It is an unfortunate reality that counterfeiters are apt to default when faced with a federal trademark lawsuit. However, it is precisely this tendency that motivated Congress to add statutory damages to the Lanham Act in 1996. *See* Anticounterfeiting Consumer Protection Act of 1996, § 7, Pub.L. No. 104–153, 110 Stat. 1386 (codified at 15 U.S.C. § 1117(c)); 141 Cong. Rec. S1207903, 1995 WL 470078 ("The option to elect statutory damages in counterfeit cases ensures that trademark owners are adequately compensated and that counterfeiters are justly punished, even in cases where the plaintiff is unable to prove actual damages because, for example, the defendant engages in deceptive record-keeping.").

**\*10** As the Second Circuit has explained,

> Congress appears to have been motivated by a gap in the law: Plaintiffs who were victorious on their civil counterfeiting claims were often unable to obtain an adequate recovery in actual damages because counterfeiters often maintain sparse business records, if any at all. In passing the Act, which allows trademark plaintiffs to elect to recover statutory damages in counterfeit cases in lieu of actual damages, Congress apparently sought to ensure that plaintiffs

would receive more than *de minimis* compensation for the injury caused by counterfeiting as a result of the unprovability of actual damages despite the plain inference of damages to the plaintiff from the defendant's unlawful behavior.

*Louis Vuitton,* 676 F.3d at 111 (internal citations omitted); *see also Nike, Inc. v. Top Brand Co.,* No. 00 Civ. 8179(KMW) (RLE), 2006 WL 2946472, at *2 (S.D.N.Y. Feb. 27, 2006) ("Congress added this provision in 1996 through the Anticounterfeiting Consumer Protection Act, specifically to address a situation where defendants have not provided sufficient records of profits for a plaintiff to establish actual damages."); *Sara Lee Corp. v. Bags of New York, Inc.,* 36 F.Supp.2d 161, 165 (S.D.N.Y.1999) ("The creation of this alternative to the more traditional damage remedies of recovery of the plaintiff's damages or the defendant's profits reflected a harsh reality— counterfeiters often do not keep or secrete records of their unlawful activities, thus making proof of the extent of the plaintiff's injury or the counterfeiters' profits impossible as a practical matter." (citation omitted)). Indeed, courts have noted that "[s]tatutory damages are most appropriate when infringer nondisclosure during fact finding leaves damages uncertain." *Sara Lee,* 36 F.Supp.2d at 165; *see also Church & Dwight Co., Inc. v. Kaloti Enters. of Mich., LLC,* 697 F.Supp.2d 287, 291 (S.D.N.Y.2009) ("The award of statutory damages is particularly appropriate in the default judgment context where plaintiff is without the benefit of any disclosure by the infringer, leaving damages uncertain."); *Century 21 Real Estate LLC v. Bercosa Corp.,* 666 F.Supp.2d 274, 290 (E.D.N.Y.2009) ("The defendants' default having made it impossible for [plaintiff] to determine the profits accrued by the defendants through the unauthorized use of [plaintiff's trademarks], statutory damages are particularly appropriate here."); *Polo Ralph Lauren, L.P. v. 3M Trading Co., Inc.,* No. 97 Civ. 4824(JSM) (MHD), 1999 WL 33740332, at *4 (S.D.N.Y. Apr. 19, 1999) (finding statutory damages appropriate where "defendants ... declined to participate in this lawsuit, and ... thus deprived plaintiffs of the opportunity to make a meaningful assessment of the extent of their business, including volume of sales and profits earned"); *Latin Am. Music Co. v. Spanish Broad. Sys., Inc.,* 866 F.Supp. 780, 782 (S.D.N.Y.1994) (Chin, D.J.) ("It is

precisely in those instances where actual damages [under the Copyright Act] are difficult to ascertain that the award of statutory damages is appropriate."). Accordingly, because Congress has specifically addressed the problem that Tiffany faces by authorizing a significant award of statutory damages against defaulting defendants, there is no need to entertain Tiffany's novel proposal of using statutory damage figures as a proxy for Defendants' profits. [7]

**11** As the Court indicated during the April 29 Hearing, the Court deems the significant amount of damages Tiffany seeks to be reasonable under the circumstances. (Hr. Tr. 35). When assessing the appropriate amount of statutory damages, courts often look for guidance to cases decided under the analogous statutory damages provision of the Copyright Act, 17 U.S.C. § 504(c). *See, e.g., Tiffany (NJ) LLC v. Dong,* No. 11 Civ. 2183(GBD)(FM), 2013 WL 4046380, at *5 (S.D.N.Y. Aug. 9, 2013) (collecting cases). Considering the factors set forth in *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110, 1117 (2d Cir.1986), that courts have applied to Copyright Act and Lanham Act cases, [8] and given the substantial scope of the infringement set forth in great detail in Tiffany's default judgment papers, the Court concludes that an award of $1,000,000 per mark per type of good infringed, which represents half of the statutory cap, "is appropriate to accomplish the dual goals of compensation and deterrence —and in particular to emphasize that the trademark laws and court proceedings are not mere incidental costs to doing business in the profitable counterfeit trade." *Gucci Am., Inc. v. Curveal Fashion,* No. 09 Civ. 8458(RJS), 2010 WL 308303, at *3 (S.D.N.Y. Jan. 20, 2010); *see also Nike,* 2006 WL 2946472, at *3 (awarding the then-maximum statutory amount of $1,000,000 per mark per type of good). With respect to the cybersquatting violations, the Court deems an award of the statutory maximum of $100,000 per infringing domain name authorized by Section 1117(d) to be appropriate for the same reasons. In total, the Court therefore will award a combined $52,300,000 in statutory damages.

### 3. A Postjudgment Asset Freeze Is Not Appropriate

The Court must next consider whether the postjudgment asset freeze contained in the Proposed Default Judgment is appropriate. First, because the Court has determined that an award of statutory damages is appropriate, there is no basis under *Grupo Mexicano* to maintain the freeze

**Tiffany (NJ) LLC v. Qi Andrew, Not Reported in F.Supp.3d (2015)**

2015 WL 3701602

on Defendants' assets. *See Grupo Mexicano, 527 U.S. at 333* (a district court "ha[s] no authority to issue a preliminary injunction preventing [a party] from disposing of [its] assets pending adjudication of [a] contract claim for money damages"); *Klipsch Grp., Inc. v. Big Box Store Ltd.,* No. 12 Civ. 6283(AJN), 2012 WL 4901407, at *2 (S.D.N.Y. Oct. 11, 2012) ("[C]ourts in this district have focused on freezing assets to preserve the equitable remedies of a return of lost profits and an accounting, not statutory damages."), *supplemented, 2012 WL 5265727, at *6 (S.D.N.Y. Oct. 24, 2012)* (noting that "statutory damages under the Lanham Act are a remedy at law, not one at equity" (collecting cases)). On this basis alone, the postjudgment asset freeze provisions must be stricken from the Proposed Default Judgment.

Furthermore, although Tiffany argues that the requested postjudgment asset freeze is the "logical extension" of what the Second Circuit approved in the prejudgment context (Hrg. Tr. 7), the Court disagrees. Even assuming Tiffany had skirted *Grupo Mexicano* by electing the standalone final equitable relief of an accounting of profits, the Court is not convinced that *Gucci* extends so logically into the realm of postjudgment asset freezes. To resurrect an argument that failed the Non–Party Banks in the prejudgment context before the Second Circuit, the Court notes that that any accounting claim at this stage is illusory. In *Gucci,* the Second Circuit found "no basis, on this record, to conclude that plaintiffs [we]re not seeking what they ask for"—i.e., an accounting of profits. *768 F.3d at 133.* In sharp contrast, here there is a basis to conclude that Tiffany is seeking something other than "what they ask for" in the Amended Complaint. Tiffany acknowledges that an accounting of profits simply will not occur. (Hrg. Tr. 7 ("[A]n accounting would require ... that the bad actor would make show you all his books and records and show you the profits that he made and turn those profits over.... My defendants are not going to do that[.]"); *id.* at 9 ("[W]e all sort of know that [the Defendants are not] going to give us the records that we actually need to figure out how must they actually sold and how much they actually owe us.")).

**\*12** Additionally, the Second Circuit was careful to cabin its decision to prejudgment asset freezes issued as part of preliminary injunctions. *See Gucci,* 768 F.3d at 129 ("[T]he district court [could] restrain the defendants' assets *pending trial."* (emphasis added)); *id.* at 130 ("[T]he district court [was authorized] to issue a preliminary injunction

requiring a party before it to refrain from moving assets *during the pendency of the proceedings."* (emphasis added)); *id.* at 131 ("district courts ... maintain th[is] equitable power ... where the plaintiff is pursuing a claim for final equitable relief, and *the preliminary injunction* is ancillary to the final relief" (emphasis added)). Indeed, the logic behind a prejudgment asset freeze is the maintenance of the status quo pending adjudication of a claim. *See Grupo Mexicano, 527 U.S. at 324; Deckert v. Independence Shares Corp.,* 311 U.S. 282, 290 (1940) ("the injunction was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill"); *Animale Grp. Inc. v. Sunny's Perfume Inc.,* 256 F. App'x 707, 709 (5th Cir.2007) (per curiam) (ruling that the district court was "authorized to preserve the status quo by entering a limited asset freeze"); *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir.2002) ("Since the assets in question here were profits ..., the freeze was appropriate and may remain in place pending final disposition of the case."); *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.,* No. 11 Civ. 3489(JMF), 2013 WL 1915330, at *2 (S.D.N.Y. May 9, 2013) ("when the plaintiff ... asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment" (internal quotation marks and citation omitted)). The Court sees no reason why a prejudgment freeze should continue into the postjudgment context, where Tiffany's claims have been fully adjudicated.

Finally, although Tiffany asserts that "the Court keeps th[e] authority to maintain the asset freeze even after entry of judgment to ensure the availability of the requested final relief" (Dkt. # 95 at 3), the Court is unconvinced that a Rule 65 injunction is an appropriate vehicle for the postjudgment restraint. A plaintiff's ordinary recourse upon securing a money judgment is to look to postjudgment remedies provided by Fed.R.Civ.P. 69 and state law. Specifically,

Rule 69(a) (1) of the Federal Rules of Civil Procedure provides that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located...." Thus, the Court must look to post-judgment remedies available, and the limitations to those remedies, under New York law.

*Motorola Credit Corp. v. Uzan,* 978 F.Supp.2d 205, 207 n. 2 (S . D.N.Y.2013). "[G]iven Rule 69's instruction that

the procedures to be utilized by federal courts to execute upon a judgment must accord with the procedure of the state where the court is located, the Court is skeptical that [a Rule 65] injunction allows [Tiffany] to skirt limitations on such relief under New York law through the use of a broad federal procedural mechanism." *Id.* at 214 (internal quotation marks and citations omitted); *cf. Grupo Mexicano,* 527 U.S. at 330–31 ("The remedy sought here could render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?"); *S & S Mach. Co. v. Masinexportimport,* 706 F.2d 411, 418 (2d Cir.1983) (rejecting attempt to skirt the requirements of the Foreign Sovereign Immunities Act "merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property" and holding "that courts in this context may not grant, by injunction, relief which they may not provide by attachment"). [9] Accordingly, the postjudgment freeze contained in the Proposed Default Judgment must be removed.

#### 4. Other Issues Raised by the Non–Party Banks

**\*13** Finally, the Court declines to address the issues raised by the Non–Party Banks regarding personal jurisdiction and comity (*see generally* Dkt. # 89, 91), as these questions are premature. *See NML Capital,* 727 F.3d at 243 (observing that "questions of personal jurisdiction ... are premature" until the nonparties "are summoned to answer for assisting in a violation of a district court's injunction[ ]"). These issues, as the Second Circuit made clear in *Gucci,* are far from trivial, and may take center stage during postjudgment execution proceedings. In a similar vein, while the Court

appreciates the Non–Party Banks' arguments regarding the application of the separate entity rule and the New York Court of Appeals' decision in *Motorola Credit Corp. v. Standard Chartered Bank,* at this stage these arguments serve little beyond illustrating the incentives Tiffany has to seek relief via a Rule 65 injunction. (*See* Dkt. # 94 (arguing that *"Motorola* makes clear that the Rule 65 injunction sought by Tiffany is nothing more than an attempted, and impermissible, end-run around the limited geographical scope of New York's postjudgment enforcement mechanisms")). *See generally Motorola Credit Corp. v. Standard Chartered Bank,* 24 N.Y.3d 149, 163 (2014) ("[W]e conclude that a judgment creditor's service of a restraining notice on a garnishee bank's New York branch is ineffective under the separate entity rule to freeze assets held in the bank's foreign branches."). Substantive consideration of the separate entity rule, as applied to the Non–Party Banks in this action, will come to pass (if at all) in the context of postjudgment proceedings under Rule 69.

#### CONCLUSION

For the reasons discussed herein, Tiffany's application for a default judgment will be GRANTED, as modified. Tiffany shall submit a revised Proposed Default Judgment that is consistent with this Opinion and Order by June 22, 2015. The Default Judgment will be so-ordered by the Court upon review for compliance with this Opinion and Order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3701602

Footnotes

1    During discovery, Tiffany sought information about Defendants from the Non–Party Banks. (*See generally* Dkt. # 38, 50, 58, 70). Citing to Chinese bank secrecy law, the Non–Party Banks objected to the production of this information. Tiffany moved to compel the Non–Party Banks to produce the requested documents. (Dkt.# 20–22, 32–34). The Banks opposed Tiffany's motion, arguing that the documents could be obtained through the Hague Convention. (Dkt.# 23–31). On July 25, 2011, Magistrate Judge Pitman denied Tiffany's motion to compel and directed Tiffany to seek discovery from the Banks via the Hague Convention. (Dkt.# 38). Judge Pauley affirmed Judge Pitman's Opinion and Order on November 14, 2011. (Dkt.# 50). On August 7, 2012, the Chinese Ministry of Justice submitted a response to Magistrate Judge Pitman, indicating it had "partly executed the requests which it deems conform to the provisions of the [Hague] Convention." (Dkt.# 60, Ex. 14). On September 20, 2012, Tiffany wrote to Magistrate Judge Pitman and District Judge Ronnie Abrams (to whom this matter had been reassigned) requesting entry of an order requiring the Non–Party Banks

to produce all remaining responsive documents. (*Id.,* Ex. 7). Following a telephonic hearing with Tiffany and the Non–Party Banks, Magistrate Judge Pitman denied Tiffany's request for further discovery, finding that he could not "conclude that [the production] is so limited that the [Hague Convention] process has been futile." (Dkt. # 58 at 6). On May 21, 2013, Judge Abrams affirmed Judge Pitman's ruling. (Dkt.# 70).

2      Tiffany also notified the Court of the pendency of the *Forbse* appeal in its application for a default judgment. (*See* Dkt. # 81 ("Halter Decl.") ¶¶ 43–45).

3      To avoid confusion with previous decisions in the instant action, the Court will refer to the Second Circuit's summary order as *Forbse.*

4      Although Tiffany argued at the hearing that the Non–Party Banks lack standing, the Court notes that Tiffany has suggested elsewhere that the Court could " 'consider[ ] [their] arguments as coming from *amici curiae.' "* (Dkt. # 95 (quoting *NML Capital,* 727 F.3d at 240)).

5      The Non–Party Banks had argued during the April 29, 2015 Hearing that such a scenario has already occurred in prior cases involving these same players, and that Tiffany and the Non–Party Banks had litigated this issue through appellate motion practice in the consolidated *Gucci* and *Forbse* appeals. *See Gucci Am. v. Bank of China,* No. 12–2317–cv, Dkt. # 166 (2d Cir. Jan. 16, 2013) (unpublished disposition) (citing *WorldCom,* 467 F.3d at 78, and denying plaintiffs' motion to dismiss the appeals for lack of jurisdiction).

6      The Court also notes that in a wide variety of contexts district courts solicit and entertain arguments from non-parties regarding proposed final judgments. *See, e.g., Aurelius Capital Partners, LP v. Republic of Argentina,* 584 F.3d 120, 127, 129 (2d Cir.2009) (where non-party sovereign appeared "on a special and limited basis before the district court to argue in favor of vacating the district court's Orders," "[t]he district court acted well within its discretion to consider [the] arguments presented ... to secure a full understanding of the jurisdictional issues"); *State of N.Y. by Vacco v. Reebok Int' l Ltd.,* 96 F.3d 44, 47 (2d Cir.1996) (finding that the district court's consideration of arguments at a fairness hearing from parties who had not filed objections was "not a grant of standing," but instead "an indication of the court's willingness to receive the comments of [the non-parties] in the capacity of amici curiae"); *Marino v. Ortiz,* 806 F.2d 1144, 1147 (2d Cir.1986) (noting that non-parties who elected not to oppose a consent decree by intervening in the lawsuit nonetheless were permitted to "present[ ] their claims at the objector hearing"); *United States v. LTV Corp.,* 746 F.2d 51, 53 (D.C.Cir.1984) (finding that a non-party "did not automatically acquire party status simply by being permitted to comment on the proposed final judgment"); *United States v. Visa U.S.A., Inc.,* 183 F.Supp.2d 613, 615 (S.D.N.Y.2001) (considering submissions received from "several non-parties, [who] submitted proposed modifications to and additional comments regarding this court's Proposed Final Judgment"), *aff'd,* 344 F.3d 229 (2d Cir.2003).

7      For reasons that will be discussed *infra,* the crucial part of the particular remedy that Tiffany proposes is the concomitant postjudgment asset freeze. The Court need not weigh in on whether a remedy that included a postjudgment asset freeze would be a more suitable or effective remedy to redress companies for the wrongs of counterfeiters. Congress has considered the issue, and answered with statutory damages provided by Section 1117(c). *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 322 (1999) (when faced with "new conditions that might call for a wrenching departure from past practice, Congress is in a much better position than we both to perceive them and to design the appropriate remedy"); *cf. id.* at 342 (Ginsburg, J., concurring in part and dissenting in part) ("Congress, of course, can instruct the federal courts to issue preliminary injunctions freezing assets pending final judgment, or instruct them not to, and the courts must heed Congress' command.").

8      Under the Copyright Act, courts look to factors such as: (i) "the expenses saved and the profits reaped"; (ii) "the revenues lost by the plaintiff"; (iii) "the value of the copyright"; (iv) "the deterrent effect on others besides the defendant"; (v) "whether the defendant's conduct was innocent or willful"; (vi) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced"; and (vii) "the potential for discouraging the defendant ." *Fitzgerald,* 807 F.2d at 1117.

9      Tiffany cites two cases, neither of which is binding on this Court, to support the maintenance of the postjudgment asset freeze under Rule 65. (*See* Dkt. # 95 at 3 (citing *Meyers v. Moody,* 723 F.2d 388, 389 (5th Cir.1984) (per curiam); *West Hills Farms, LLC v. ClassicStar, LLC,* 2013 WL 4515046, at *1 (E.D.Ky. Aug. 23, 2013))). The Court declines to adopt a reading of a postjudgment asset freeze remedy under Rule 65 that would seemingly subsume the postjudgment remedies provided by Rule 69 and state law.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4091002
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Zia U. HASHAM, Plaintiff,
v.
CALIFORNIA STATE BOARD
OF EQUALIZATION, Defendant.

No. 96 C 3326.
|
Aug. 21, 2008.

**Attorneys and Law Firms**

Fern N. Trevino, Law Office of Fern N. Trevino, Chicago, IL, Zia U. Hasham, Lake in the Hills, IL, for Plaintiff.

Grace Allen Newton, Law Offices of Grace Allen Newton, Chicago, IL, for Defendant.

*OPINION AND ORDER*

WILLIAM T. HART, District Judge.

**\*1** In 1996, plaintiff Zia Hasham brought this employment discrimination lawsuit against defendant California State Board of Equalization. Plaintiff is currently an employee of defendant and has been since 1981. Following a jury trial, it was found that defendant had discriminated against plaintiff in denying him promotion to a Supervisor I position. Following a ruling on postjudgment motions, *see Hasham v. California Sate Bd. of Equalization,* 1998 WL 456558 (N.D.Ill. July 31, 1998), a judgment was entered in favor of plaintiff awarding him damages and prejudgment interest and injunctive relief requiring that he be promoted to a Supervisor I position in defendant's Houston office, with seniority status retroactive to August 1993. Initially, the injunctive relief was stayed pending appeal. However, when a Supervisor I opening occurred in Houston, the stay was lifted and it was ordered that plaintiff be promoted within 14 days. *See Hasham v. California Sate Bd. of Equalization,* 1998 WL 887083 (N.D.Ill.Dec.11, 1996). Effective December 24, 1998, plaintiff received the salary increase and actually began working at the new position

in January 1999. In the new position, plaintiff was placed in probationary status which was to last for one year. Subsequently, the July 31, 1998 judgment was affirmed on appeal. *See Hasham v. California Sate Bd. of Equalization,* 200 F.3d 1035 (7th Cir.2000).

In September 1999, plaintiff brought a motion denominated as a Rule 60(b) motion for injunctive relief. He alleged that he was being retaliated against and requested that the judgment be amended to prohibit retaliation and to provide either front pay in lieu of continued employment or a transfer back to his Chicago tax auditor position but at Supervisor I pay. Before the motion was ruled upon, it was represented that the dispute had been resolved between the parties so the motion was stricken. Independent of the court, the parties entered into an agreement (the "1999 Agreement") which provided, in part, that plaintiff would return to his former tax auditor position in Chicago.

In October 2000, still represented by counsel, plaintiff moved to enforce the July 31, 1998 judgment order. Plaintiff contended defendant had not complied with the injunctive relief contained therein because it had placed him in probationary status. Plaintiff further contended that being in probationary status allowed defendant to threaten terminating his employment, thereby enabling defendant to force plaintiff to accept the terms of the 1999 Agreement in which he agreed to return to his tax auditor position. Plaintiff's motion was denied. It was held that being a Supervisor I in probationary status satisfied the injunctive relief that was ordered. *See* Order dated July 17, 2001 [docket entry 210] ("Hasham VII"). There being no violation of the judgment order, it was held that there was no other basis for granting plaintiff any relief. Plaintiff promptly moved for reconsideration, which was denied by a minute order entered on August 1, 2001.

**\*2** There were no more filings in the case until April 2006 when plaintiff moved for equitable relief in lieu of the previously ordered injunctive relief. Plaintiff contends defendant never provided the promotion required by the July 1998 judgment. He contends that defense counsel made misrepresentations leading the court to believe that the ordered promotion had occurred. In lieu of still requiring the promotion—plaintiff represents that the Houston Office has been substantially downsized so it would not be in the public interest to now require that California add a supervisor to the Office—plaintiff

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 1

requests that he instead be promoted from a Business Taxes Specialist I ("BST–I") to a BST–II assigned to the Houston Office. Plaintiff also moves for discovery compelling defendant to disclose to him a report of an investigation of travel expenses in the Houston Office. Plaintiff contends this investigation covered the time period when he was a Supervisor I in Houston and will help support his contention that he was forced out of his Supervisor I position. Plaintiff contends it was difficult for him to be a supervisor in that he received no support from his superiors, including in his attempt to stop his employees from claiming improper travel expenses. Plaintiff now contends that being in probationary status and not receiving support from his superiors contributed to his being forced to step down from the Supervisor I position. [1] Defendant opposes both motions. [2] Defendant contends that plaintiff's motion for equitable relief is barred by contrary rulings in *Hasham VII* or should be denied as untimely and, with no open case or other pending motion, there is no basis for granting the discovery motion. Defendant also moves for sanctions pursuant to Fed.R.Civ.P. 11 or 28 U.S.C. § 1927 on the ground that plaintiff's motions are frivolous. [3]

In *Hasham VII,* this court carefully considered whether placing plaintiff in probationary status when promoted pursuant to a court order was appropriate. It was held that injunctions should be construed narrowly, in the context in which they were entered, and to avoid conflict with statutes or regulations that would otherwise apply to the litigants. *Id.* at 13. It was further held that California statutes did not require nor prohibit probationary status for a court-ordered promotion, but that it was consistent with the spirit of the applicable California statutes to impose probationary status for such a promotion. *Id.* at 14–16. It was also found that requiring a year of probation was consistent with the context in which the July 1998 judgment was entered. *Id.* at 16–18. Additionally, it was found that the rule of narrow construction supported permitting a probationary period. *Id.* at 18. For the foregoing reasons, it was held that placing plaintiff in probationary status did not violate the July 1998 judgment. It was found that defendant had already complied with the injunctive relief ordered so there was no basis for further enforcing the judgment. [4] *Id.* at 19. Since plaintiff was not otherwise entitled to relief, it was unnecessary to consider whether the 1999 Agreement

would be a bar to any of the claimed relief. *See id.* at 19–20. [5]

**\*3** Ignoring issues of timing and whether this court presently has authority to modify the 1998 judgment, the law of the case doctrine presumes that the holdings in *Hasham VII* are correct and should not be modified absent good reason and circumstances where modifying the prior ruling will not unduly harm the party that benefitted from the prior ruling. *United States v. Harris,* 531 F.3d 507, 513 (7th Cir.2008); *Trustees of Pension, Welfare, & Vacation Fringe Benefit Funds of IBEW Local 701 v. Pyramid Elec.,* 223 F.3d 459, 463 n. 4 (7th Cir.2000); *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1227 (7th Cir.1995). Even ignoring the modest presumption of the law of the case doctrine, plaintiff points to no sufficient reason for modifying the prior holding that defendant complied with the 1998 judgment for injunctive relief in late 1998 when it placed plaintiff in a probationary Supervisor I position in Houston. Plaintiff contends that defendant misrepresented what occurred and that plaintiff's counsel did not sufficiently understand the applicable California statutes. Plaintiff, however, does not point to facts that are different from what was known at the time of the prior ruling nor does he point to any California statute or regulation that would alter the prior ruling. For the reasons stated in *Hasham VII,* plaintiff has already received the injunctive relief that was ordered so there is no reason to modify that relief to instead order that he be placed in a BST–IT position. That is a sufficient reason to deny plaintiff's request for equitable relief and moots the need for any related discovery.

Even if plaintiff's present arguments had merit, the motion for equitable relief would be denied as untimely. Plaintiff contends his motion is one pursuant to Fed.R.Civ.P. 60(b)(6). Rule 60(b) (6) does not encompass grounds that fall under other subsections of Rule 60(b). *Webb v. James,* 147 F.3d 617, 622 (7th Cir.1998); *United States v. Krilich,* 152 F.Supp.2d 983, 992 n. 12 (N.D.Ill.2001), *aff'd,* 303 F.3d 784 (7th Cir.2002). Since plaintiff bases his motion, in part, on the purported misrepresentations of defendant, his motion arguably falls under Rule 60(b)(3), which must be brought within a year of the entry of judgment. *See* Fed.R.Civ.P. 60(c)(1). Plaintiff filed his motion almost ten years after the entry of judgment. Even if his motion is pursuant to Rule 60(b)(6), it must be brought within a reasonable time. *See* Fed.R.Civ.P. 60(c)(1). Since plaintiff does not raise any facts or issues that would not have

been known to him in 1999 when he stepped down as a Supervisor I, filing his motion in 2008 was not within a reasonable time. To the extent plaintiff's equitable relief motion is pursuant to Rule 60(b), it would clearly be untimely.

Even if plaintiff, presently a *pro se* litigant, was not otherwise aware of the time restrictions for a Rule 60(b) motion, he would have been well aware of those restrictions because they are expressly mentioned in *Hasham VII,* at 19 & n. 13. Also, plaintiff's present motion makes arguments based on his alleged mistreatment while a Supervisor I. Plaintiff would be well aware of the express statements in *Hasham VII,* at 9–10 & n. 6, that any claim for retaliation would have to be raised in a separate lawsuit and would have to comply with the administrative exhaustion requirements of Title VII or avoid the Eleventh Amendment bar to bringing a claim directly against a state.

**\*4** Plaintiff's other suggestion is that he can bring his equitable relief motion pursuant to Fed.R.Civ.P. 60(d). Plaintiff does not expound upon this provision, but perhaps he is referring to Rule 60(d)(3) which permits a judgment to be set aside at any time based on a fraud on the court.[6] A fraud on the court is different from the fraud covered by Rule 60(b)(3). "The term ['fraud on the court'] refers to coaduct more egregious than anything here, conduct that might be thought to corrupt the judicial process itself, as where a party bribes a judge or inserts bogus documents into the record." *Oxxford Clothes XX, Inc. v. Expeditors Int'l of Wash., Inc.,* 127 F.3d 574, 578 (7th Cir.1997). *See also Boyer v. GT Acquisition LLC,* 2007 WL 2316520 \*4–5 (N.D.Ind. Aug.9, 2007). As further stated in *Oxxford:* "A lie uttered in court is not a fraud on the liar's opponent if the opponent knows it's a lie yet fails to point this out to the court. If the court through irremediable obtuseness refuses to disregard the lie, the party has ... a remedy by way of appeal. Otherwise 'fraud on the court' would become an open sesame to collateral attacks, unlimited as to the time within which they can be made by virtue of the express provision in Rule 60(b) on this matter, on civil judgments." 127 F.3d at 578. The purported fraud asserted by plaintiff is not the type of fraud that falls within Rule 60(d)(3) and which may be raised at any time.

The other possibility is that plaintiff is referring to Rule 60(d)(1) which permits an independent action to relieve a party from a judgment.[7] This procedure, however, is limited to injustices that are sufficiently gross to permit departure from the usual rules. *United States v. Beggerly,* 524 U.S. 38, 46, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998) (quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 244, 64 S.Ct. 997, 88 L.Ed. 1250 (1944)). An independent action is limited to preventing a grave miscarriage of justice. *Beggerly,* 524 U.S. at 47; *Porter v. Chicago Sch. Reform Bd. of Tr.,* 187 F.R.D. 563, 566 (N.D.Ill.1999). It does not apply to failure of a party to furnish accurate information that could be a basis for a Rule 60(b)(3) motion. *Beggerly,* 524 U.S. at 46. Defendant's supposed misrepresentation as to plaintiff's job status is not a sufficient ground for bringing an independent action. *Cf. Porter,* 187 F.R.D. at 566.

Plaintiff's motion for equitable relief will be denied because it is an untimely Rule 60(b) motion and no other basis exists for considering the grounds raised in the motion. Alternatively, the motion would be denied on its merits. Since plaintiff's case is closed and the equitable relief motion is not properly before the court, there is no basis for granting any discovery. The discovery motion will also be denied.

Still to be considered are defendant's motions for sanctions. Defendant requests sanctions under both Fed.R.Civ.P. 11 and 28 U .S.C. § 1927. Rule 11(c)(2) requires that a Rule 11 sanctions motion "be made separately from any other motion." It also requires that the Rule 11 motion first be served on the opposing party and that it "must not" be filed with the court if the challenged paper is withdrawn within 21 days after service. According to the notice of motion [docket entry 226] filed by defendant, the two sanction motions were mailed to plaintiff on May 21, 2008, which constitutes the date of service. Fed.R.Civ.P. 5(b)(2)(C). Twenty-one days thereafter was Wednesday, June 11. Since service was by mail, however, three additional days are added, plus the ensuing weekend. Fed. R. Civ. p. 6(a)(3), 6(d); *Lerro v. Quaker Oats Co.,* 84 F.3d 239, 242 (7th Cir.1996).[8] Thus, the 21–day period under Rule 11(c)(2) did not expire until Monday, June 16. Defendant, however, filed its sanction motions with the court on June 9. Since defendant failed to comply with the 21–day requirement of Rule 11(c)(2), sanctions cannot be imposed based on defendant's Rule 11 motions. Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.: Civil 3d* § 1337.2 at 723 (2004).[9]

**\*5** Still to be considered are defendant's requests for sanctions pursuant to § 1927. That statute provides; "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The Seventh Circuit has noted a split in the circuits as to whether this statute applies to *pro se* litigants, but did not have to resolve that issue. *See Alexander v. United States, 121 F.3d 312, 316 (7th Cir.1997).* At least one district court case in this circuit has held that § 1927 does not ordinarily apply to a *pro se* litigant. *Kim v. Earthgrains Co., 2003 WL 41643 \*1 (N.D.Ill. Jan.3, 2003).* Although § 1927 refers to sanctioning attorneys, defendant makes no argument as to why it should be construed as applying to a *pro se* litigant. This court will follow the reasoning in *Kim* and decline to apply § 1927 sanctions to a *pro se* litigant. No sanctions will be awarded.

IT IS THEREFORE ORDERED that defendant's motions to strike [219, 220] are denied without prejudice. Plaintiff's motion to file a surreply [230] is granted. Plaintiff's motion for equitable relief [213] is construed as a motion pursuant to Fed.R.Civ.P. 60(b) and is denied as untimely. Plaintiff's motion to obtain documents [215] is denied. Defendant's motions for sanctions [223, 225] are denied.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4091002

Footnotes

1   In the preliminary statements of the 1999 Agreement and according to representations previously made to the court, it was concerns about the health of plaintiff's wife that prompted the decision to step down and return to Chicago. Plaintiff now contends this was an agreed-upon fabrication to provide a medical justification for his transfer back to Chicago.

2   Instead of simply filing a brief opposing plaintiff's motion, defendant moves to strike plaintiff's motions. Plaintiff's motions will not be stricken, but the arguments contained in defendant's motions to strike will be considered.

3   Recently plaintiff moved to file a surreply. That motion will be granted and the surreply has been considered.

4   To the extent plaintiff was seeking to modify the injunction to expressly prohibit placing him in probationary status, it was noted that the then-pending motion was untimely if construed as a Fed.R.Civ.P. 60(b) motion.

5   Plaintiff had also requested that the 1999 Agreement be declared void. It was held that the court lacked jurisdiction to directly consider the 1999 Agreement. *Hasham VII,* at 8–10. The 1999 Agreement would only have been considered as a defense to plaintiff's request to enforce the 1998 judgment.

6   Prior to the December 2007 amendment to Rule 60, this provision—formerly "fraud *up* on the court"—was contained in the second last sentence of Rule 60(b).

7   Prior to the December 2007 amendment to Rule 60, this provision was contained in the second last sentence of Rule 60(b).

8   The result is the same if weekend days are not counted based on Rule 6(a)(2) applying to the three-day period of Rule 6(d). *See, e.g., Best Buy Stores, L.P. v. Developers Diversified Realty Corp.,* 2008 WL 2439850 \*1 n. 3 (D.Minn. July 12, 2008).

9   Cases are split as to whether including a request for § 1927 sanctions with a request for Rule 11 sanctions, as did defendant in this case, violates the separate motion requirement of Rule 11(c) (2) and therefore would also be grounds for denying the request for Rule 11 sanctions. Compare *Harris v. Franklin–Williamson Human Serv., Inc.,* 97 F.Supp.2d 892, 910 (S.D.Ill.2000), with *Ridder v. City of Springfield,* 109 F.3d 288, 294 n. 7 (6th Cir.1997); *In re Lindemann,* 2007 WL 4354426 \*6 (Bankr.N.D.Ill. Dec, 10, 2007); and *In re Kitchin,* 327 B.R. 337, 362–63 (Bankr.N.D.Ill.2005). Also, Rule 11 may be otherwise inapplicable to plaintiff's discovery motion. *See* Fed.R.Civ.P. 11(d).

**End of Document**                                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.